**PARKER et al. v. LESTER et al.**

**No. 30484.**

United States District Court
N. D. California, S. D.

June 1, 1951.

Richard Gladstein, San Francisco, Cal., for petitioners.

Edgar Bonsall, Asst. U. S. Atty., San Francisco, Cal., and Marvin Taylor, Department of Justice, Washington, D. C., for respondents.

MURPHY, District Judge.

This is an action by seven merchant seamen and three longshoremen seeking to enjoin the defendants, officers of the United States Army and Coast Guard, stationed in the San Francisco area, from enforcing the provisions of 33 CFR Chapter 1, Subchapters (K) and (L) (regulations of the United States Coast Guard Commandant for the Security of Vessels and Waterfront Facilities, promulgated pursuant to Executive Order 10173, Oct. 18, 1950, [15 F.R. 7005–7008] and Public Law 679, 81st Cong., 2d Sess., known as the Magnuson Act 50 U.S.C.A. §§ 191, 192, 194), and for a declaration of rights. The complaint was framed alternatively as either a class or individual suit.

The grounds asserted for the injunction are that the regulations of the Commandant and the actions taken pursuant thereto are illegal and unauthorized by the statute. Pending a final hearing, plaintiffs now apply for a preliminary injunction restraining the named officials, or persons unknown to them who act under the direction or in concert with the named defendants, from enforcing the regulations. Defendants have asserted certain jurisdictional defenses and, without waiving them, have filed in opposition to the application for a preliminary injunction the affidavits of Vice-Admiral Merlin O'Neill, Commandant of the United States Coast Guard not named as a party hereto, and of Major General J. A. Lester, United States Army, named as a defendant herein.

### Statutory Background.

Briefly the background of the statute, executive order and regulations giving rise to this controversy may be outlined as follows:

Because of activities within and without the United States which constitute a serious threat to the security and safety of this country, the need for the protection of merchant vessels of the United States, as well as the waters and harbors and harbor facilities of the United States, became of grave public importance to the Congress and the President. Security in this field is essential to our national defense, to the implementation of the North Atlantic Pact, Economic Cooperation Administration, and to the prosecution of hostilities in Korea. The availability of the merchant vessels of the United States, the integrity of the Merchant Marine, as well as the security of the waters and harbors of the United States in time of war, are particularly vital to the safety of the United States.

These considerations, among others, led to the introduction in Congress of the bill which later became the so-called Magnuson Act, which is an amendment of Title II of the Act of June 15, 1917, 50 U.S.C.A. §§ 191, 194. With the approval of the President on August 9, 1950, this amendment became law. The amendment authorizes the President "Whenever [he] finds that the security of the United States is endangered by reason of actual or threatened war, or invasion, or insurrection, or subversive activity, or of disturbances or threatened disturbances of the international relations of the United States" to institute measures and institute rules and regulations, and to employ such departments, agencies, offices and instrumentalities of the United States as he may deem necessary, (a) to control foreign flag vessels within the United States territorial waters in order to secure them from damage or injury, or to prevent damage or injury to the harbors or waters of the United States, or to secure the observance of rights and obligations of the United States, and also (b) to safeguard vessels, harbors and waterfront facilities of the United States against destruction, loss or injury from sabotage, or other subversive acts, accidents, or other causes of a similar nature.

As stated in the affidavit of the Commandant, "There were believed to be present among workers on vessels and on the waterfronts persons who were prepared or inclined—especially if war should occur with certain foreign powers—to engage in acts of sabotage such as sinking vessels in harbors or channels or at sea, causing fires, explosions or other damage to structures, implements, machinery and supplies, inducing unrest, strikes and work slowdowns, or to engage in acts of espionage in aid of sabotage or in aid of the enemy."

In order to effectuate the essential safeguards required for our national security and safety, the President, pursuant to the authority lodged in him by the Magnuson Act, on October 18, 1950 promulgated Executive Order 10173 (supra). In the executive order the President stated: "I hereby find that the security of the United States is endangered by reason of subversive activity, and I hereby prescribe the following regulations relating to the safeguarding against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, of vessels, harbors, ports, and waterfront facilities in the United States * * and the said regulations shall constitute Part 6, Subchapter A, Chapter I, Title 33 of the Code of Federal Regulations; and all agencies and authorities of the Government of the United States shall, and all state and local authorities and all persons are urged to, support, conform to, and assist in the enforcement of these regulations and all supplemental regulations issued pursuant thereto".

In the language of the Presidential regulations "no person shall be issued a document required for employment on a merchant vessel of the United States" (except such categories of vessels as may be exempted by the Commandant), "nor shall any licensed officer or certificated man be employed on a merchant vessel of the Unites States" (subject to the same exception) "if the Commandant is satisfied that the character and habits of life of such person are such as to authorize the belief that the presence of the individual on board would be inimical to the security of the United States."

In his regulations the President authorized the Commandant to require specifically

validated documents or identification credentials "issued by or otherwise satisfactory to the Commandant". The identification credential to be issued by the Commandant shall be known as a "Coast Guard Port Security Card". "The conditions and manner of its issuance shall be as prescribed by the Commandant after consultation with the Secretary of Labor".

The executive order prohibits the issuance by the Commandant of a Coast Guard Port Security Card "if he is satisfied that the character and habits of life of the applicant therefor are such as to authorize the belief that the presence of such individual on board a vessel or within a waterfront facility would be inimical to the security of the United States", and authorize the revocation of Coast Guard Port Security Cards when the Commandant "is no longer satisfied that the holder is entitled thereto." The Commandant is authorized to recognize for the same purpose such other credentials as he may designate in lieu of the Coast Guard Port Security Card.

The Commandant is further authorized to designate categories of merchant vessels which shall be exempt from this requirement. The Commandant is also authorized to designate certain waterfront facilities, access to which requires the presentation of identification credentials acceptable to the Commandant.

The executive order further provides that persons who are refused employment or documents shall have the right of appeal to boards appointed by the Commandant. The appeal boards are directed to "consider each appeal brought before it and, in recommending final action to the Commandant, shall insure the applicant of fairness consistent with the safeguarding of the national security".

Following the promulgation by the President of this executive order and regulations, and in compliance with the congressional and executive mandate, after extended conferences with the Secretary of Labor and following a public hearing attended by representatives of labor, management, the press, interested Government agencies and public organizations, which were given an opportunity to express their views and criticisms, the Commandant issued regulations for the security of vessels and waterfront facilities effective on and after December 27, 1950.

As outlined in his affidavit, the regulations of the Commandant in substance provide that no person may be employed on a merchant vessel of the United States unless he has in his possession a document indicating his "security clearance" following a "security check". "Security check" is defined as "the processes or actions taken by the Commandant" to determine whether the employee "is a safe and suitable person to be employed" on the vessel. "A safe and suitable person is one whose character and habits of life are such as to authorize the belief that his presence aboard vessels of the United States is not inimical to the security of the United States." "Security clearance" is defined to be the approval by the Commandant for employment on such vessels. The document evidencing security clearance is in the form of a Merchant Mariner's Document endorsed to show the clearance. No document indicating security clearance "shall be issued except upon prior approval of the Commandant".

The provisions of the regulations as to the basis for rejecting applications for security clearance are as follows:

"(d) *Basis for rejection.* The Commandant will deny a security clearance to any person if, upon full consideration, he is satisfied that the applicant's character and habits of life are such as to authorize the belief that the presence of the person aboard vessels of the United States would be inimical to the security of the United States; and the basis of rejection as above will be if, on all the evidence and information available, reasonable grounds exist for the belief that the individual:

"(1) Has committed acts of treason or sedition, or has engaged in acts of espionage or sabotage; has actively advocated or aided the commission of such acts by others; or has knowingly associated with persons committing such acts; or,

"(2) Is employed by, or subject to the influence of, a foreign government under

circumstances which may jeopardize the security interests of the United States; or

"(3) Has actively advocated or supported the overthrow of the government of the United States by the use of force or violence; or,

"(4) Has intentionally disclosed military information classified confidential or higher without authority and with reasonable knowledge or belief that it may be transmitted to a foreign government, or has intentionally disclosed such information to persons not authorized to receive it; or,

"(5) Is or recently has been a member of, or affiliated, or sympathetically associated with, any foreign or domestic organization, association, movement, group, or combination of persons (i) which is, or which has been designated by the Attorney General as being, totalitarian, fascist, communist, or subversive, (ii) which has adopted, or which has been designated by the Attorney General as having adopted, a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or (iii) which seeks, or which has been designated by the Attorney General as seeking, to alter the form of the Government of the United States by unconstitutional means: *Provided,* That access may be granted, notwithstanding such membership, affiliation, or association, if it is demonstrated, by more than a mere denial, that the security interests of the United States will not thereby be jeopardized."

In addition to the above requirements, the following requirements apply to the issuance of Port Security Cards:

"(f) That such person is otherwise not a suitable and safe person to have access to such waterfront facilities and port and harbor areas, including vessels therein, by reason of:

"(1) Having been adjudged insane, having been legally committed to an insane asylum, or treated for serious mental or neurological disorder, without evidence of cure;

"(2) Having been convicted of any of the following felonies, indicative of a criminal tendency potentially dangerous to the Security of such waterfront facilities and port and harbor areas, including vessels therein; arson, unlawful trafficking in drugs, espionage, sabotage or treason.

"(3) Drunkenness on the job or addiction to the use of narcotic drugs, without adequate evidence of rehabilitation."

Persons denied clearance, or who are required to surrender their validated documents, "shall be notified in writing" and have the right of appeal first to a local appeal board and thence to a national appeal board.

Pending the establishment of appeal boards made up of representatives of management, labor and the Coast Guard, a Coast Guard official has been appointed in each Coast Guard district to act as the local appeal board in that district, and a board of five Coast Guard officials to act as the national appeal board. At the present time, appeals are being processed in the San Francisco area in accordance with this temporary procedure. No good reason was given by the government for failing to convene the tripartite board.

As to the clearance of shoreside employees in connection with the security of waterfront facilities, the regulations issued by the Commandant prescribe that the identification credentials which are satisfactory to the Commandant are the Coast Guard Port Security Card, the Merchant Mariner's Document bearing evidence of security clearance, Armed Forces Identification Card, and identification credentials issued by Federal law enforcement and intelligence agencies to their officers and employees, and such other identification as may be approved by the Commandant from time to time. "The Commandant will, from time to time, direct Captains of the Port of certain ports to prevent access of persons who do not possess one or more of the identification credentials [just described] to those waterfront facilities and port and harbor areas, including vessels and harbor craft therein, where the following shipping activities are conducted: (1) Those vital to the Military Defense Assistance Program; (2) those pertaining to the support of U. S.

military operations; (3) those pertaining to loading and unloading explosives and other dangerous cargoes." No such areas have as yet been designated by the Commandant.

The same appeal boards and appeal procedures apply to security clearance of persons desiring access to designated waterfront facilities as govern the security of merchant vessels. As stated in the affidavit, the decision as to the exclusion of individuals from merchant vessels of the United States and from waterfront vessels when such areas are designated, is, and must be under the Executive Order, made by the Commandant of the Coast Guard and not by any subordinate.

### Statement of the Facts

Six of the merchant seamen, Parker, Mendelsohn, White, Kulper, Rolfs, and Fontaine, have been denied employment on merchant vessels because of findings by the Commandant of the Coast Guard that their character and habits are such as to authorize the belief that their presence aboard vessels of the United States would be inimical to the security of the United States. The basis for denying clearance to these men has been set forth in considerable detail in the affidavit of the Commandant (pp. 19–23). The appeals of five of these seamen have not as yet been passed on by the national board, nor finally determined by the Commandant. Only one of these plaintiffs, Theodore W. Rolfs, has been finally denied a Coast Guard Port Security Card.

A seventh seaman, Claude Payney, was denied employment upon a finding by the Commandant that his presence on board would be inimical to the interests of the United States. On appeal, however, the Commandant reversed this finding and concurred with the recommendation of clearance by the appeals board.

The three remaining plaintiffs, shoreside workers, claim to be injured in various ways by actions taken by the defendants under the Commandant's regulations. As with the other six plaintiffs, none of these remaining plaintiffs has exhausted his administrative remedy.

It should be pointed out in this connection that one of these shoreside workers, Taylor, has been denied a Port Security Card by the Commandant because of drunkenness, whether on the job (as required by the regulations) does not appear. In view of this action by the Commandant, the Commanding General of the Port of Embarkation in San Francisco, J. A. Lester, named as a defendant herein, has directed Taylor to turn in his waterfront security badge which had been issued to him by the Army on January 12, 1951 and has denied him access for work at the Port of Embarkation.

Claiming that the regulations are unconstitutional and illegal, and that they are suffering irreparable injury, the plaintiffs request this Court for a preliminary injunction restraining the enforcement of the regulations, pending the final disposition of this suit.

### Discussion

■ Respondents challenge the jurisdiction of this Court upon several grounds. First, they contend that service of process upon them was insufficient in that it was not made in accordance with Rule 4(d) (5) of the Federal Rules of Civil Procedure, 28 U.S.C.A., pertaining to service upon officers of the United States government. In reply to this contention, the petitioners say they are not suing them as officers of the United States, but only as private persons. Reliance is placed upon Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, at pages 701–702, 69 S.Ct. 1457, at page 1467, 93 L.Ed. 1628, where the Supreme Court stated: "the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for a specific relief against the officer as an individual * * * if it is not within the officer's statutory powers or, if within those powers * * * if the powers, or their exercise in the particular case, are constitutionally void." See also Justice Burton's opinion in Joint Anti-Fascist Refugee Committee v. McGrath, 71 S.Ct. 624, 632. Despite certain broad language in the complaint (seeming to question the validity of

the Magnuson Act) petitioners made clear at the hearing that their attack was confined to the constitutionality of the Commandant's regulations and to the manner in which these regulations were being administered by the named subordinates. As thus delimited, the action may properly proceed upon service as provided by Rule 4(d) (1).

■ Respondents' second objection, that this petition for preliminary injunction should be heard by a three-judge court pursuant to the mandate of 28 U.S.C. § 2282 is similarly without merit since, as stated above, the constitutionality of the Magnuson Act is not challenged.

■ Thirdly, it is contended that the Commandant is an indispensable party to these proceedings. It is agreed that the principles enunciated in Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 189, 92 L.Ed. 95, are controlling. The parties are at odds, however, as to how they are to be applied. The Supreme Court in that case announced the following formula: "(T)he superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him." The injunctive relief sought in the present action is purely negative in character. In brief, petitioners pray that the named respondents be forbidden to interfere with their job opportunities. This calls for no act, either direct or indirect, on the part of the Commandant. This distinguishes it from the cases cited by respondents, including those of Daggs v. Klein, 9 Cir., 169 F.2d 174, and Money v. Wallin, 3 Cir., 186 F.2d 411, where reinstatement was sought by certain civil service employees. Just as in Williams v. Fanning, supra, or Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231, the injunction expends itself on the subordinate officers who are before the Court. Similarly, it is immaterial that these officers would be left under a command of their superior to do what this Court may forbid. By the same token, the criminal sanctions imposed by 50 U.S.C.A. § 192, as amended by the Magnuson Act,

are no obstacle to such a conclusion if in fact the regulations issued by the Commandant or the manner in which they are executed by the respondents fall within a constitutional prohibition. Nor is Mine Safety Appliance Co. v. Forrestal, 326 U.S. 371, 694, 66 S.Ct. 219, 90 L.Ed. 140, apposite. Taking, as we must for the purposes of testing jurisdiction, the allegations of the complaint as true, the respondents have illegally interfered with substantial property rights of the plaintiffs and are answerable as individuals for their actions.

■ Respondents' second major contention is that this suit is premature since all of the plaintiffs who have been denied clearance, except plaintiff Rolfs, have failed to exhaust their administrative remedies. We do not find this an insuperable objection. True, it is the general rule that a Court will not intrude itself into a controversy until such administrative remedies as may be available to the litigant have been exhausted. As stated by Justice Frankfurter in his concurring opinion in the Joint Anti-Fascist Refugee Committee case, 71 S.Ct. 624, at page 639 supra: "Although a litigant is the person most directly affected by the challenged action of the Government, he may not have 'standing' to raise his objections in a court if the action has not, as it were, come to rest." This exposition is footnoted by the explanation that "Government action is 'final' in the sense here involved when at no future time will its impact on the petitioner become more conclusive, definite, or substantial." This rule, however, is not without exception, as Justice Frankfurter points out: " 'Finality' is not, however, a principle inflexibly applied. If the ultimate impact of the challenged action of the petitioner is sufficiently probable and not too distant, and if the procedure by which the ultimate action may be questioned is too onerous or hazardous, standing is given to challenge the action at a preliminary stage." Matters such as this call for a practical determination. As was stated in Columbia Broadcasting System v. United States, 316 U.S. 407, at page 425, 62 S.Ct. 1194, at page 1204, 86 L.Ed. 1563: "The ultimate test of reviewability is not to be found in an

overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control."

In numerous decisions it has been recognized that "A determination of administrative authority may * * * be made at the behest of one so immediately and truly injured by a regulation claimed to be invalid, that his need is sufficiently compelling to justify judicial intervention even before the completion of the administrative process." Eccles v. Peoples Bank of Lakewood Village, Cal., 333 U.S. 426, 68 S.Ct. 641, 645, 92 L.Ed. 784; see also Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L. Ed. 1796; Varney v. Warehime, 6 Cir., 147 F.2d 238; Farrell v. Moomau, D.C., 85 F.Supp. 125; United States v. Rock Royal Co-op, D.C., 26 F.Supp. 534. This, indeed, is the position of petitioners. Each of them, with the partial exception of Payney and Taylor, has been deprived of the right to work in his common calling. Each day the injury, both financial and to reputation is intensified, and no compensatory recourse is available to the aggrieved even if he prevails in some later administrative review. Payney, although temporarily approved by the Commandant, has no assurance that tomorrow he will not be "screened-off" just as he was before by the peremptory edict of the Commandant. Whether this contingency is sufficiently close to give him standing in this suit we find it unnecessary to decide in view of the general nature of the issues presented and their over-all effect upon the class represented. Similarly, we find it unnecessary to rule on petitioner Taylor, who has been subject to a much more narrow form of deprivation. These questions may more properly be disposed of after a hearing on the merits.

Nor does this Court agree with respondents third contention that to grant the relief sought would constitute an "unwarranted interference" with the Executive functions of the Government. Although entitled to great respect, neither Administrative regulations nor action taken pursuant thereto is sacrosanct. Those who founded this nation placed upon the judiciary the grave responsibility of safeguarding constitutional rights regardless of from what quarter comes the attack, and where it is established that freedom has been subverted judicial interference is mandatory.

This leads us to the final issue of the proceeding, whether the injunction pendente lite should issue. Counsel have ably presented their opposing views. Petitioners have described the summary manner in which they were initially deprived of the right to follow their chosen occupation and, in effect, blacklisted by the Coast Guard without notice or hearing. They have pictured the "Appeal Board" hearings conducted by a single Coast Guard officer (although the Commandant's regulations provide for three members, representing the Coast Guard, management, and labor) as a "star chamber" proceeding. The petitioners were required to wait sixty to ninety days for a hearing. They were not confronted with witnesses. They were required to refute unrevealed (and unsworn) evidence from secret accusers, and to prove themselves innocent of charges so general as to defy effective answer (e. g., "your presence on board a vessel would be inimical to the security of the United States. This finding is based on the belief that you are affiliated with, or sympathetic to an organization, association, group, or combination of persons subversive or disloyal to the government of the United States."). There is no point in detailing every matter presented. Suffice it to say that this Court was made fully aware of the grave constitutional questions which remain to be answered, questions which probe the very marrow of procedural due process and which are underlined by the comments of the Supreme Court in the Joint Anti-Fascist case and the Bailey case, Bailey v. Richardson, 71 S.Ct. 669.

On the other hand, the Government has argued that whatever the academic or ulti-

mate merit in petitioners' claims, the preliminary injunction should be denied because its issuance would be detrimental to the public interest and national security. Its issuance would frustrate the entire program of security now being carried out by the government to safeguard our vessels and waterfront facilities during this critical juncture of world affairs.

 The issue presented in a proceeding of this kind is extremely narrow and, however vital the merits, this court can do no more than weigh the immediate conflicting interests. Accordingly, a preliminary injunction will not issue where the injury to the applicant if a preliminary injunction is refused will undoubtedly be less than the injury to the defendants if it is granted. Kryptok Co. v. Stead Lens Co., 8 Cir., 190 F. 767, 769, 39 L.R.A.,N.S., 1, and cases cited therein. This well established principle takes on extra vitality when, as here, the public interest would suffer immeasurably by the issuance of an injunction.

 Thus, in the case of Yakus v. United States, 321 U.S. 414, 440–441, 64 S.Ct. 660, 674, 88 L.Ed. 834, the Supreme Court stated:

"The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. (Citations). Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. (Citations). And it will avoid such inconvenience and injury so far as may be, by attaching conditions to the award, such as the requirement of an injunction bond conditioned upon payment of any damage caused by the injunction if the plaintiff's contentions are not sustained. (Citations).

"But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. * * * This is but another application of the principle (citation), that 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' "

 The underlying issue of this controversy is epitomized in the words of Justice Douglas in the Joint Anti-Fascist case where he said: "The problems of security are real. So are the problems of freedom. The paramount issue of the age is to reconcile the two." This proceeding is not the place in which that issue may be resolved. [71 S.Ct. 624, page 650.] However grievous the personal deprivation petitioners have suffered, the additional sacrifice they are called upon to make by this denial of their motion bulks small beside the incalculable loss which might result if this court summarily suspended, even in part, the security program. The Preliminary Injunction and Declaratory Judgment are denied.