**PARKER et al. v. LESTER et al.**

No. 30484.

United States District Court
N. D. California, S. D.

April 21, 1953.

Gladstein, Andersen & Leonard, San Francisco, Cal., for petitioners.

Donald B. MacGuineas, Department of Justice, Washington, D. C., Chauncey Tramutolo, U. S. Atty., San Francisco, Cal., for government respondents.

Brobeck, Phleger & Harrison, by Benjamin B. Law, San Francisco, Cal., for respondent Steamship Companies.

MURPHY, District Judge.

This is an action by six merchant seamen seeking to enjoin the enforcement of 33 CFR, Chapter 1, Subchapters (A) and (K) (regulations of the United States Coast Guard Commandant for the Security of Vessels and Waterfront Facilities promulgated pursuant to Executive Order 10173, October 18, 1950, 15 F.R. 7005–8, U.S.Code Cong.Service 1950, p. 1661, as amended by Executive Order 10277, August 1, 1951, 16 F.R. 7537, 8, U.S.Code Congressional and Administrative Service 1951, p. 1073 and Executive Order 10352, May 19, 1952, 17 F.R. 4607, U.S.Code Congressional and Administrative News 1952, p. 1056 and Public Law 679, 81st Cong., 2d Sess., known as the Magnuson Act, 50 U.S.C.A. §§ 191, 192, 194 and for a declaration of rights. The complaint was framed alternatively as either a class or individual suit. The defendants are certain officers of the United States Coast Guard, stationed in the San Francisco area, who are charged with enforcing the above regulations, as well as 31 Steamship Companies operating out of San Francisco which are by order of the Coast Guard prevented from employing seamen who have not received "clearance" under the regulations. In addition, certain United States Army Officers are named as parties respondent. Their responsibility is to administer the above regulations under direction of the Coast Guard Commandant with regard to longshoremen and similar shore side workers. Three such longshoremen originally joined as petitioners in this action; however, their petitions, as well as that of one of the seamen petitioners, were dismissed on their own motion prior to trial. Although no motion to dismiss the Army defendants has been made, this action is moot as to them. An application for a preliminary restraining order was denied in Parker v. Lester, D.C.Cal.1951, 98 F.Supp. 300.

## Statutory Background

Briefly, the background of the statute, executive order and regulations giving rise to this controversy may be outlined as follows:

In a national program designed to secure the country from internal and external dangers, serious attention must be given to protecting waters, harbor facilities and merchant vessels. Awareness of the importance and vulnerability to attack of maritime activities and areas led to the introduction in Congress of the bill which later became the so-called Magnuson Act, which is an amendment of Title II of the Act of June 15, 1917, 50 U.S.C.A. §§ 191, 194. With the approval of the President on August 9, 1950, this amendment became law. The amendment authorizes the President "Whenever [he] finds that the security of the United States is endangered by reason of actual or threatened war, or invasion, or insurrection, or subversive activity, or of disturbances or threatened disturbances of the international relations of the United States" to institute measures and issue rules and regulations, and to employ such departments, agencies, offices and instrumentalities of the United States as he may deem necessary, (a) to control foreign flag vessels within the United States territorial waters in order to secure them from damage or injury, or to prevent damage or injury to the harbors or waters of the United States, or to secure the observance of rights and obligations of the United States, and also (b) to safeguard vessels, harbors and waterfront facilities of the United States against destruction, loss or injury from sabotage, or other subversive acts, accidents, or other causes of a similar nature.

In order to effectuate the essential safeguards required for our national security and safety, the President, pursuant to the authority lodged in him by the Magnuson Act, promulgated Executive Order 10173 on October 18, 1950. In the Executive Order the President stated: "I hereby find that the security of the United States is endangered by reason of subversive ac-

tivity, and I hereby prescribe the following regulations relating to the safeguarding against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, of vessels, harbors, ports, and waterfront facilities in the United States * * * and the said regulations shall constitute Part 6, Subchapter A, Chapter I, Title 33 of the Code of Federal Regulations; and all agencies and authorities of the Government of the United States shall, and all state and local authorities and all persons are urged to, support, conform to, and assist in the enforcement of these regulations and all supplemental regulations issued pursuant thereto."

In the language of the Presidential regulations "No person shall be issued a document required for employment on a merchant vessel of the United States" (expect such categories of vessels as may be exempted by the Commandant), "nor shall any licensed officer or certificated man be employed on a merchant vessel of the United States" (subject to the same exception) "unless the Commandant is satisfied that the character and habits of life of such person are such as to authorize the belief that the presence of the individual on board would not be inimical to the security of the United States".

Pursuant to the Congressional and executive mandate, the Commandant issued regulations for the security of vessels and waterfront facilities effective December 27, 1950. Such action was preceded by extended conferences with the Secretary of Labor and by a public hearing at which representatives of labor, management, the press, interested Government agencies and public organizations attended and expressed their views and criticisms.

The regulations of the Commandant in substance provide that no person may be employed on a merchant vessel of the United States unless he has in his possession a document indicating his "security clearance" following a "security check". "Security check" is defined as "the processes or actions taken by the Commandant" to determine whether the employee "is a safe and suitable person to be employed" on the vessel. "A safe and suitable person is one whose character and habits of life are such as to authorize the belief that his presence aboard vessels of the United States is not inimical to the security of the United States". "Security clearance" is defined to be the approval by the Commandant for employment on such vessels. The document evidencing security clearance is in the form of a Merchant Mariner's Document endorsed to show the clearance. No document indicating security clearance "shall be issued except upon prior approval of the Commandant". 33 C.F.R. 121.02, .05, .07, .09, .15.

The provisions of the regulations as to the basis for rejecting applications for security clearance are as follows:

"(d) *Basis for rejection.* The Commandant will deny a security clearance to any person if, upon full consideration, he is satisfied that the applicant's character and habits of life are such as to authorize the belief that the presence of the person aboard vessels of the United States would be inimical to the security of the United States; and the basis of rejection as above will be if, on all the evidence and information available, reasonable grounds exist for the belief that the individual:

"(1) Has committed acts of treason or sedition, or has engaged in acts of espionage or sabotage; has actively advocated or aided the commission of such acts by others; or has knowingly associated with persons committing such acts; or,

"(2) Is employed by, or subject to the influence of, a foreign government under circumstances which may jeopardize the security interests of the United States; or,

"(3) Has actively advocated or supported the overthrow of the government of the United States by the use of force or violence; or,

"(4) Has intentionally disclosed military information classified confidential or higher without authority and with reasonable knowledge or belief that it may be transmitted to a foreign

government, or has intentionally disclosed such information to persons not authorized to receive it; or,

"(5) Is or recently has been a member of, or affiliated, or sympathetically associated with, any foreign or domestic organization, association, movement, group, or combination of persons (i) which is, or which has been designated by the Attorney General as being, totalitarian, fascist, communist, or subversive, (ii) which has adopted, or which has been designated by the Attorney General as having adopted, a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or (iii) which seeks, or which has been designated by the Attorney General as seeking, to alter the form of the Government of the United States by unconstitutional means: *Provided*, That access may be granted, notwithstanding such membership, affiliation, or association, if it is demonstrated, by more than a mere denial, that the security interests of the United States will not thereby be jeopardized."

Persons initially denied clearance or who are required to surrender their validated documents are so notified in writing and have the right to appeal to a local appeal board and thence to a national appeal board, both composed, as far as practicable, of one Coast Guard member as chairman, one member from Management and one from Labor. 33 C.F.R. 6.10–9. While such tripartite boards have by now been established, interim boards composed of one Coast Guard official locally and five Coast Guard officials at the National Capitol sat until June, 1951. The Management and Labor representatives are nominated by the Secretary of Labor, and it is required that the board "shall insure the appellant all fairness consistent with the safeguarding of the national security". Part 6.10–9. Every effort must be made "to protect the interest of the United States and of the appellant". In performing their duties, the members of the board "should at all times avoid the attitude of prosecutor". Part

121.23b. As a matter of policy, the labor member of the board customarily belongs to appellant's union. The appellant receives notice of his security denial and the general basis for it. He has the right to file a written answer, to appear personally before the board, be present during the entire hearing, be represented by counsel or other representative of his choosing, and present evidence in his own behalf, through witnesses or by documents, or both. Parts 121.21(a)3 and 121.21(b). Data "whose disclosure would be inimical to the security of the United States, or the interest of the appellant, shall not be disclosed to unauthorized persons". The board *may* (emphasis supplied) ask the appellant or witness any question necessary to obtain the fullest possible disclosure of material facts. Part 121.23(e). In case of an adverse decision, the appellant is furnished with a copy of the transcript of the hearing after deletion of classified information. Part 121.23h. The board is required to consider the demeanor and credibility of witnesses and the probability of their testimony as well as the authenticity of documentary evidence. Part 121.25a.

The local board sends its recommendation, together with a statement of its reasons, and all documentary data directly to the Commandant. Part 121.25d. Upon adverse decision by the Commandant, following the recommendation of a local appeal board, the appellant is advised of the decision in writing and is informed of his right further to appeal to the National Appeal Board, Parts 121.25e and 121.27. That board's procedure is essentially the same as that of the local boards. Part 121.-29. The Commandant is the final authority to grant or deny security clearance, Part. 121.31a and informs the appellant in writing of the final decision. Part 121.31b.

## Statement of Facts

Four of the merchant seamen, Parker, Mendelsohn, Rolfs, and Fontaine, have been denied employment on merchant vessels because of findings by the Commandant of the Coast Guard that their "character and habits * * * are such as to authorize the belief that (their) presence

on board would be inimical to the security of the United States". Petitioner Parker had at one time been cleared but was subsequently ordered to turn in his validated Merchant-Mariner's Document on the basis of after-acquired information. The last two petitioners, Payney and Kulper, have been cleared by the Commandant, the former on the basis of a favorable report by an interim board, the latter on that of a tripartite local board. Both of these petitioners, having in mind the fate of petitioner Parker, base their right to relief on the lack of finality of the Commandant's determination and the consequent danger that the petitioners may in the future be deprived of their validated documents. A determination that a seaman is a poor security risk deprives him immediately of the opportunity to earn a living at his chosen profession.

The mechanics of the determinations on the basis of which the petitioners' appeals were denied merit some attention. Pursuant to the requirement set forth in the regulations that a person denied clearance must be informed of the "general basis" for such denial, a form letter was sent to each petitioner advising him that "* * * this finding is based on the belief that you are affiliated with, or sympathetic to an organization, association, group, or combination of persons subversive or disloyal to the Government of the United States". The procedure during the actual "hearing" varied from case to case, a pronounced difference being however noticeable between the practice of the interim and that of the tripartite board. Thus, petitioner Kulper, appearing before a tripartite board, was informed of and questioned at length by the examiners concerning specific instances of alleged misconduct about which the board had information. Kulper managed to persuade the board that he was not a security risk. On the other hand, the procedure before the interim one man board was epitomized by the case of petitioner Parker. At the outset, Parker was informed that he was believed to be a member of the Communist Party and that the burden was on him to clear himself. He categorically denied such membership and then was conducted by his attorney through an aimless exploration of his background and associations, at the conclusion of which, the examiner, despite counsel's urging, declined to address any questions to petitioner. Parker was not cleared. In no proceeding before an appeals board did witnesses appear against a petitioner, thus depriving him of an opportunity for cross-examination, nor was he ever shown the file containing the information on which the Coast Guard acted. The board members, themselves, had no personal knowledge of the reliability and veracity of the informers and had to rely on the degree of creditability which a governmental investigative agency accorded such sources of information.

Not one of the petitioners has exhausted his administrative remedies. By the time of the trial, only petitioner Rolf's appeal had been heard and rejected by the national appeal board and the Commandant; however, he, as well as all the other petitioners who appeared before an interim local board, was given an opportunity subsequently to appear before a tripartite board.

Claiming that the regulations go beyond statutory authority and violate the due process clause of the Fifth Amendment, petitioners seek to enjoin their enforcement.

### Discussion

■ This suit is properly brought as a class action under Rule 23(a)(3) of the Federal Rules of Civil Procedure, 28 U.S. C.A. More than six hundred seamen who were initially denied clearance have appealed to the local appeals board sitting within the jurisdiction of this Court. In the cases of at least 150 of the appellants, the appeals board refused to disturb the initial determination. The class locally affected by the clearance program is so large as to make it impracticable to bring all members before the Court. While each person concerned has a separate cause of action, common questions of law and fact underlie their rights and a common relief is sought. There has been no suggestion that the interests of the petitioners conflict in any manner with the unnamed members

440

of the class. Hansberry v. Lee, 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; Clark v. Chase National Bank, D.C.N.Y.1942, 45 F.Supp. 820; 2 Barron and Holtzoff, Federal Practice and Procedure 146 (1950). As the petitioners adequately represent a class similarly aggrieved, I do not reach the question of whether petitioners Payney and Kulper have standing to sue in their individual capacities.

■■■ Respondents renew their objections to the jurisdiction of this Court which they had previously raised when this cause was before me on petition for a preliminary injunction. Parker v. Lester, D.C.N.D.Cal.1951, 98 F.Supp. 300. First, they contend that service should have been made on them qua officers of the United States Government in accordance with Rule 4(d)(5) of the Federal Rules of Civil Procedure and that the Commandant of the Coast Guard is an indispensable party as he administers and is responsible for the seamen's screening program. Both questions were briefed and argued upon the motion for a preliminary injunction, and I decided them there. Parker v. Lester, supra, at pages 306 and 307. No authorities subsequently adduced by respondents impel me to depart from my prior holding. I reaffirm that the government respondents were properly served as individuals and that the Coast Guard Commandant is not an indispensable party as the decree sought is negative and can expend itself on the Commandant's local subordinates.

We come then to the most substantial of respondents' jurisdictional objections, namely, that this suit is premature as petitioners have not exhausted their administrative remedies. Only petitioner Rolfs has been finally refused a validated document by the Commandant, and even he has been invited to appear again before a local board—this time a tripartite one—for a re-examination of the issues.

■■■ The rule is well established that resort to the courts must generally await the conclusion of such administrative proceedings as are available to a petitioner. At the outset, however, attention must be directed to the fact that petitioners here do not challenge a factual determination made by the appeals board; rather, they complain that the regulations setting forth the appeals procedure are unauthorized by statute and Constitution and therefore void. No special familiarity with complicated factual situations is necessary for the granting of relief; no administrative expertese comes into play. The issue, here, is one wholly of law. In short, the policy considerations which underlie judicial forbearance are inapplicable. Under such circumstances, Mr. Justice Brandeis, speaking for an undivided Court, affirmed a petitioner's right to court action without first resorting to the administrative agency. Skinner & Eddy Corporation v. United States, 1918, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772. See also Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563; United States ex rel. De Lucia v. O'Donovan, 7 Cir., 1949, 178 F.2d 876; Koepke v. Fontecchio, 9 Cir., 1949, 177 F.2d 125; Trans-Pacific Airlines v. Hawaiian Airlines, 9 Cir., 1949, 174 F.2d 63; Varney v. Warehime, 6 Cir., 1945, 147 F.2d 238.

■■■ The rule of exhaustion is subject to additional qualifications. The Supreme Court stated in Eccles v. Peoples Bank of Lakewood Village, California, 1948, 333 U.S. 426, 434, 68 S.Ct. 641, 645, 92 L.Ed. 784, that "a determination of administrative authority may of course be made at the behest of one so immediately and truly injured by a regulation claimed to be invalid, that his need is sufficiently compelling to justify judicial intervention even before the completion of the administrative process." But a strong showing is required, both of inadequacy of the prescribed procedure, and of threatened or impending irreparable injury flowing from delay incident to following the prescribed procedure, before shortcircuiting of the administrative process is permitted. Aircraft and Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796. See also Mr. Justice Frankfurter, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 156, 71 S.Ct. 624, 640, 95 L.Ed. 817: " 'Finality'

is not * * * a principle inflexibly applied. If the ultimate impact of the challenged action on the petitioner is sufficiently probable and not too distant, and if the procedure by which that ultimate action may be questioned is too onerous or hazardous, 'standing' is given to challenge the action at a preliminary stage." In the case at bar, each petitioner has appeared before a local board; one has been finally screened; it remains for the rest to submit their case to a board sitting in Washington, D. C. and to have the determination of that body reviewed by the Commandant, who has already twice ruled adversely to each petitioner. That the national board will reverse the local one in the absence of a personal appearance or the introduction of new matter is not very likely, and it is certainly onerous for an unemployed seaman to travel from San Francisco to Washington, D. C. Most significantly, petitioners are by the administrative action prevented from earning a living at their chosen trade, and they allege that they are ineligible for unemployment compensation as denial of clearance imparts the stigma of misconduct. In Reeber v. Rossell, D.C.N. Y.1950, 91 F.Supp. 108, discharge of plaintiffs from government employment was held such irreparable injury as to warrant judicial intervention pending the conclusion of the administrative process. The injury to petitioners in this case is certainly far greater. I hold that they have standing to sue.

 That holding can also be supported on the alternate ground that one of the petitioners, Rolfs, has been finally denied clearance by the Commandant, and that he adequately represents the class. It is true that he has been offered another appearance before the local board. But the Supreme Court has held that the rule of exhaustion does not automatically require judicial review to be withheld whenever rehearing is authorized but not sought. Levers v. Anderson, 1945, 326 U.S. 219, 66 S. Ct. 72, 90 L.Ed. 26. To hold otherwise could postpone judicial review indefinitely at the caprice of an agency. Opportunity for rehearing must be heeded only where "* * * in a particular administrative

pattern new opportunities to challenge afforded by the motion for rehearing may subject an order to such critical administrative review as to reduce it to the level of a 'mere preliminary or procedural' status, thereby divesting it of those qualities of administrative finality essential to invocation of judicial review." Levers v. Anderson, supra, 326 U.S. at pages 222, 223, 66 S.Ct. at page 74. The rehearing offered petitioner Rolfs would be conducted pursuant to the same statute and regulations but before a board differently constituted. Such a rehearing would not reduce the prior order to a "mere preliminary or procedural" status. It would not satisfy the rule of the Levers case.

 We now reach matters of substance. Petitioners first insist that the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., with its elaborate provisions for notice and hearing governs these proceedings.

That act is on its face not applicable. Section 1004, dealing with adjudications provides in its preamble that: "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved * * * (4) the conduct of military, naval, or foreign affairs functions; * * *." The Magnuson Act, 50 U.S.C.A. § 191 does not provide for adjudication on the record after a hearing. The determinations made by the Commandant are not hearings within the meaning of the Administrative Procedure Act. Moreover, Executive Order 10173, 15 F.R. 7005–8 promulgated under authority of that statute states that "* * * as President of the United States, I hereby find that the security of the United States is endangered by reason of subversive activity, and I hereby prescribe the following regulations relating to the safeguarding against destruction, loss, or injury from sabotage or other subversive acts * * * of vessels, harbors, ports, and waterfront facilities in the United States, and all territory and water, continental or insular, subject to the jurisdiction of the United States * * *." Evidently, the President was operating in the area of military and naval affairs.

Petitioners, in support of their contention, urge upon the Court the case of Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616, holding that the hearing provisions of the Administrative Procedure Act govern deportation proceedings though the applicable statute does not in terms require adjudication on the record after opportunity for an agency hearing. Contrary to petitioners' contention, the Court did not rule that all administrative action not falling expressly under one of the exceptions is subject to the administrative Procedure Act; the Court merely determined that the requirement of a formal hearing had been previously read into the deportation statute by the Supreme Court and that the Administrative Procedure Act was therefore applicable. Wong Yang Sung v. McGrath, supra, 339 U.S. at page 50, 70 S.Ct. at page 454.

Congress, moreover, did not intend to have these proceedings conducted pursuant to the Administrative Procedure Act. Senator Magnuson, the sponsor of the statute in question, stated that it would give the President the authority to invoke the same kind of security measures which were invoked in World War I and in World War II. 96 Cong.Rec. 10794. Screening procedures in effect during World War II were more summary than those presently in force. See directives of the Commandant of the Coast Guard issued in Washington, D. C., April 15, 1942 and July 20, 1942, pursuant to Executive Order No. 9074, U.S. Code Cong.Service 1942, p. 1230.

A glance at the legislative history of the statute especially the above-quoted statement by Senator Magnuson also disposes of petitioners' argument that the regulations setting forth the screening procedure were not contemplated and authorized by the statute. The procedure must be invalidated, if at all, by an appeal to the Constitution.

And that is petitioners' final and most strongly pressed argument. They contend that the procedure here invoked deprives them of due process of law in violation of the Fifth Amendment. In evaluating that argument, attention must first be given to the type of the right they claim is infringed.

Petitioners are by operation of the screening procedure prevented from securing employment on privately owned vessels above 100 gross tons—in effect, the entire Merchant Marine. They strongly urge that seamen are in the same category as cooks, butchers, clergymen and teachers in private schools, all of whom have been held constitutionally entitled to the right of employment and the free exercise of their profession. Truax v. Raich, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co., 1884, 111 U.S. 746, 4 S.Ct. 652, 28 L.Ed. 585; Cummings v. Missouri, 1866, 4 Wall 277, 71 U.S. 277, 18 L. Ed. 356; Meyer v. Nebraska, 1923, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. Respondents, on the other hand, insist that employment as a seaman is at best a "qualified privilege" rather than a right, the merchant marine being a business affected with a public interest and subject to governmental regulations. The Court takes judicial notice of the statutory scheme laying down qualification tests for various ships' officers, imposing limitations on the percentage of alien seamen and even spelling out physical condition and experience requirements for employment as crew members. Respondents analogize the status of petitioners to that of liquor dealers, auto drivers and lobster fishermen whose licenses can be revoked without fanfare. State Board of Equalization v. Superior Court, 1935, 5 Cal. App.2d 374, 42 P.2d 1076; Commonwealth v. Cronin, 1939, 336 Pa. 469, 9 A.2d 408, 125 A.L.R. 1455; State v. Cote, 1923, 122 Me. 450, 120 A. 538. Lastly, respondents urge the similarity between a merchant mariner and a government employee, the latter not being considered "entitled" to such employment. Bailey v. Richardson, 1950, 86 U.S.App.D.C. 248, 182 F.2d 46, affirmed without opinion by an equally divided court, 1951, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. With regard to the Bailey case, it is certainly significant that no majority of the Justices of the Supreme Court could be found to hold that a government employee may be fired for security reasons on the basis of a "hearing" similar to, but

in a number of respects less summary than, the one accorded petitioners here.

The Court need not lose itself in esoteric distinctions and determine the precise point at which a privilege turns into a right. The deprivations suffered by petitioners are substantial. In the hierarchy of legally protected values, the right to private employment occupies a lofty place—certainly a higher one than occupancy of a government job or possession of a driver's license. But judicial solicitude for the petitioners, however great, is limited by countervailing considerations of equal magnitude.

The countervailing consideration here in play is the undoubted right of the Nation to protect itself from subversion. Both the Supreme Court and the Court of Appeals for this Circuit have taken judicial notice of the existence and extent of the world crisis and of the threat presented by the Communist Party. Dennis v. United States, 1951, 341 U.S. 494, 511, 71 S.Ct. 857, 95 L. Ed. 1137; Carlson v. Landon, 9 Cir., 1951, 187 F.2d 991, 997. And the President promulgated the regulations governing the screening program on the basis of an express finding that the security of the United States was endangered by reason of subversive activity. Executive Order 10173, 15 F.R. 7005 (1950):

"Due process of law * * * formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. * * * That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." Betts v. Brady, 1942, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595. Where national security is involved, the courts have gone far in permitting limitation of the usual procedural protections. The summary relocation and detention of an entire national group was approved. Korematsu v. United States, 1944, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194. So was the precipitate removal of a worker from a war plant. Von Knorr v. Miles, D.C.Mass. 1945, 60 F.Supp. 962, reversed on other grounds sub nomine Von Knorr v. Griswold, 1 Cir., 1946, 156 F.2d 287, and the detention without bail and deportation of resident aliens without notice and hearing. Carlson v. Landon, 1952, 342 U.S. 524, 72 S. Ct. 525, 96 L.Ed. 547; Ludecke v. Watkins, 1948, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881.

But while the due process clause may assume a somewhat different posture when the safety of the Nation is threatened, a court need not desist from scrutinizing governmental action as soon as the cry of security is raised. Such complete judicial self-abnegation was practiced in the case of Gove, Sayre and Lazar v. Farley (D.C.D.C., Civil Action No. 4596–49) where the court declined to examine the Coast Guard Commander's action in denying security clearance to certain ships' radio operators. But see Mr. Justice Douglas, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 174, 71 S.Ct. 624, 650, 95 L.Ed. 817: "The problems of security are real. So are the problems of freedom. The paramount issue of the age is to reconcile the two." Such reconciliation is not effected when the courts stand mute while security subjugates freedom. On the contrary, where substantial rights are involved, the government must shoulder the burden of affirmatively justifying before the courts all deviations from accepted procedure.

In this context, then, I define due process in terms of the maximum procedural safeguards which can be afforded petitioners without jeopardizing the security program. At the outset, it must be remarked that opportunity for confrontation and cross-examination of adverse witnesses cannot be afforded a petitioner in these situations without destroying the security program. The Federal Bureau of Investigation has uniformly insisted that practically none of the evidential sources available will continue to be available to it if proper secrecy and confidence cannot at all times be maintained with respect to the original

source of information.[1] In view of the fact that Constitutional guarantees of confrontation and cross-examination are in terms applicable only to criminal trials, Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 180, 71 S.Ct. 624, 95 L. Ed. 817, I conclude that in this instance, considerations in favor of protecting the investigatory tasks of governmental agencies outweigh the disadvantages flowing to the individual petitioners.

 Nor are petitioners entitled to an administrative determination prior to being screened off vessels. Due process does not require that a hearing be granted at the initial stage of an administrative proceeding. In fact, public necessity of a much less pressing order than the prevention of espionage and sabotage has often been held to justify administrative orders or other action followed subsequently by a hearing. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (price regulations) ; North American Cold Storage Co. v. City of Chicago, 1908, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195, (summary destruction of property for protection of public health) ; Central Union Trust Co. v. Garvan, 1921, 254 U.S. 554, 41 S.Ct. 214, 65 L. Ed. 403 (seizure of property of enemy aliens) ; Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (rent control orders).

 But in some particulars, the ability of petitioners to state their case before the appeals board was unreasonably impeded by procedures not justifiable on grounds of security. In the first place, in cases such as these, no reason appears why the Commandant could not apprise petitioners of the basis for his initial determination with such specificity as to afford them reasonable notice and an opportunity to marshal the evidence in their behalves. The same is true of the conduct of the examination by the board. While it may not be feasible to reveal to petitioners the source of the evidence against

them, no reason appears in common sense or respondents' argument why petitioners should not be informed of the contents of the testimony. Thus a bill of particulars should be furnished upon demand and petitioners should be given an opportunity to rebut specific allegations of misconduct or other acts and associations which the board considers probative. No less an authority on espionage and the mechanics of its prevention than General Donovan has suggested that individuals accused of being bad security risks be informed of the contents of the examiner's dossier. Donovan and Jones, Program for a Democratic Counter Attack to Communist Penetration of Government Service, 58 Yale L.J. 1211, 1235 (1949). See also generally Gellhorn, Security Loyalty and Science, Ch. VIII (1950). And the Government Loyalty Review Board, which evaluates evidence and determines issues of the same character as those confronting the Commandant, has seen no objections to furnishing challenged employees with a bill of particulars and affording them full opportunities at the hearing of meeting specific allegations.[2] The proceedings before the local appeal board in the cases of some of the petitioners, especially in that of petitioner Kulper, approached the standard here set forth in that the petitioners were allowed to traverse fairly specific allegations, but the fear of another "hearing" such as that accorded petitioner Parker impels me to formalize my holding.

 A limited injunction and a declaration of rights will issue. That order will enjoin the respondents hereinafter named from executing and enforcing any final determination of the Commandant to exclude petitioners or any of them permanently from any United States Merchant Vessels unless the appeals procedure preliminary to the Commandant's final determination shall have been conducted in accordance with the opinion. Pending such final determination, arrived at pursuant to pro-

1. Press release of Mr. Seth Richardson, former chairman of the Government Loyalty Review Board, dated December 23, 1947, reprinted in the Washington Post, December 28, 1947, p. 10 Col. 3–8.

2. Press release, Mr. Seth Richardson, note 1, supra. See also Bailey v. Richardson, 1950, 86 U.S.App.D.C. 248, 182 F.2d 46.

ceedings here delineated, nothing contained herein shall prevent the Commandant (over whom this Court has no jurisdiction) or his local subordinates from interfering with petitioners' employment or issuing such other lawful orders as they may see fit.

Lastly, the problem of framing an effective decree. Since this action was filed two years ago, many of the Coast Guard Officials originally sued have been replaced and have left the jurisdiction. A few days after this case was argued, counsel for petitioners filed a pleading denominated "Motion to Add Parties Respondent". Though the heading of the motion would indicate that it was filed pursuant to Rule 21, F.R.C.P. in order to remedy an initial non-joinder of parties respondent, the allegations in the motion are phrased so as to qualify for relief under Rule 25(d), F.R.C.P., dealing with the substitution of one government official for another who has ceased to hold office. The last paragraph of the motion states that it is made upon the provisions of Rules 21 and 25(d), F.R.C.P.

The officials sought to be added by the motion are Rear Admiral McElligott, the commanding officer of the 12th Coast Guard District, Captain Whittlesey, the Captain of the Port of San Francisco, Captain McGurn, the official having direct supervisory authority over the officers administering the local phases of the screening program and Mr. Frediani, the Assistant Shipping Commissioner.

 Admiral McElligott is the successor to respondent Stika. As to him, the motion must be brought, if at all, under Rule 25(d), F.R.C.P. and will be denied for non-compliance with the provisions of that Rule. Petitioners' motion, among other things, does not allege that it was made within six months after the successor took office. Respondents filed objections to the motion which affirmatively showed that the substitution of officers was effected more than six months before the motion was filed. The six months period is jurisdictional. Snyder v. Buck, 1950, 340 U.S. 15, 71 S.Ct. 93, 95 L.Ed. 15. Admiral McElligott is not properly before the Court.

The motion to add Captain Whittlesey is denied as the record shows that his duties in no way involve administration of the seamen's screening program.

The situation is different as to Captain McGurn and Mr. Frediani. These two individuals have not taken over the functions of parties initially named respondents; they are officials concerned with the administration of the screening program who have not previously been joined. Pursuant to Rule 21, F.R.C.P., the motion to add them as parties respondent is granted. Curacao Trading Co. v. Federal Insurance Co., 2 Cir., 1943, 137 F.2d 911, certiorari denied, 321 U.S. 765, 64 S.Ct. 521, 88 L.Ed. 1061. See generally 2 Barron and Holtzoff, Federal Practice and Procedure, § 543 (1950).

The decree can effectively expend itself on Captain McGurn, the officer exercising supervision over the local administration of the screening program, and on his successors and all persons acting in concert with him or under his direction and control.

Let an appropriate order be prepared in accordance with the Rules.