## VON KNORR v. GRISWOLD.
### No. 4104.

Circuit Court of Appeals, First Circuit.
June 28, 1946.

---

J. C. Johnston of Boston, Mass., for appellant.

Charles E. Cunningham, Asst. U. S. Atty., of Boston, Mass. (John F. Sonnett, Asst. Atty. Gen., Edmund J. Brandon, U. S. Atty., of Boston, Mass., and Hubert H. Margolies, Atty., Dept. of Justice, of Washington, D. C., of counsel), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Hans von Knorr is a naturalized citizen of the United States who, on and before August 13, 1943, was employed by Cities Service Oil Company at Boston, Massachu-

setts. On that day an Army Officer representing Major General Sherman Miles, Commanding General, First Service Command, served upon the assistant manager of Cities Service Oil Company at 660 Beacon Street, Boston, a letter addressed to the company stating as follows:

"By direction of the Commanding General, First Service Command, you are hereby directed to remove Mr. Hans Von Knoor, 199 Canton Street, Dedham, Mass. from employment on and access to work under War and Navy Department contracts, or anything pertaining to such work.

"It is requested that a complete report on the action taken by you to effect such removal be transmitted promptly to this office.

"The United States Employment Service Office, 9 Beacon Street, Boston, Mass. may assist Mr. Von Knoor in obtaining employment outside of plants having War or Navy Department contracts, if he makes suitable application directly to that office.

"If Mr. Von Knoor wishes to contest the above removal, he may appeal within thirty (30) days in writing to the Office of the Provost Marshal General, Washington, D. C.

"Very truly yours,
"William J. Bingham,
"Lieutenant Colonel, G. S. C.
"Director, Internal Security Division."

In response to this letter plaintiff's employer at once terminated his employment, and plaintiff has not since been employed in any capacity by the company.

On November 4, 1943, plaintiff filed his complaint in the court below against General Miles, alleging that defendant was engaged in and was about to engage in acts and practices constituting a violation of plaintiff's rights under the Fifth Amendment. The complaint prayed that the order to Cities Service Oil Company to discharge plaintiff from employment be declared void, and that a decree be issued enjoining defendant, his agents and successors in office, from directing Cities Service Oil Company to remove plaintiff from its employment and from interfering in any other manner with the plaintiff in the pursuit of his lawful calling.

It appears from the agreed statement of facts that, prior to taking the action above described, General Miles had caused an investigation of the plaintiff to be made; that said investigation was conducted without notice to the plaintiff; that witnesses were interviewed in his absence without advising him thereof, and that plaintiff was not present either personally or by counsel during any stage of the investigation. After the termination of his employment, and within the time allowed, plaintiff appealed to the Office of the Provost Marshal General, Washington, D. C., for review of the order or direction in the letter of August 13, 1943. By letter dated October 26, 1943, signed by Lt. Col. Bingham, plaintiff was advised that the Industrial Employment Review Board had considered the entire record in the case, including additional information developed since the removal, and had found that plaintiff's removal "was effected with sufficient cause"; that this "in effect means that you are not to be reemployed by the Cities Service Oil Co., or by any other company on work being done on War or Navy Department contracts or subcontracts for the duration."

The district court ruled that on the facts there was no diversity of citizenship; but upheld its jurisdiction under Judicial Code § 24(1) (a), 28 U.S.C.A. § 41(1) (a), on the ground that the suit was of a civil nature where the matter in controversy exceeded the sum of $3,000 and arose "under the Constitution or laws of the United States." Upon consideration of the merits, the court entered judgment dismissing the complaint. This judgment is challenged in the present appeal.

On November 13, 1945, after the appeal was taken, Maj. Gen. Miles was relieved from assignment and duty as Commanding General, First Service Command, and was succeeded in that capacity by Lt. Gen. Oscar W. Griswold. Upon motion of appellant, we entered an order on April 1, 1946, substituting General Griswold in place of General Miles as party appellee.

■ A motion has been filed by appellee asking that the appeal be dismissed for the reason that the cause has become moot, on the following ground: On October 26, 1945, a communication was sent to the Commanding General, First Service Command, by the Industrial Employment Review Board, Provost Marshal General's Office, stating that the Board, after reexamining the record in von Knorr's case in view of the cessation of hostilities, now directs that: "The limitations imposed by the removal in the case of the employee be, and the same are hereby, withdrawn as of the date of this letter, except as to employment in connection with secret and top secret War Department and Navy Department contracts." This information was relayed by the office of the Commanding General, First Service Command, in letters to von Knorr, his counsel, the U. S. Employment Service Office at Boston, Cities Service Oil Company, and the Commandant of the First Naval District at Boston. In each of these letters, referring to the modification of the original removal order, the following statement is made: "This in effect means that Mr. Hans Von Knorr may be reemployed by the Cities Service Oil Company, or any other company, on any type work other than secret and top secret War Department and Navy Department contracts." Also attached to the motion to dismiss was an affidavit by the Vice-President of the Cities Service Oil Company, dated November 26, 1945, stating that in its domestic marketing operations "Cities Service Oil Company does not hold, nor is it engaged in, any contract with the United States Army, Navy, or other governmental department or agency, which is designated 'top secret' or 'secret'."

It will be noted from the above that the original order of removal has been withdrawn only in part, and that as interpreted by the office of the Commanding General, First Service Command, it still stands as an obstacle to employment of von Knorr by Cities Service Oil Company, or any other company, on any work involving secret and top secret War or Navy Department contracts. Under the circumstances we are not satisfied that the cause is moot, and therefore we deny the motion to dismiss the appeal.

On the point whether the complaint came within Judicial Code § 24(1) (a), the dis-

trict court stated the issue as follows [60 F.Supp. 962, 966]:

"Both parties agree that for plaintiff to bring his case within the quoted language [of Jud.Code § 24(1) (a)] he must at the least show that he has been deprived of his employment by an act of defendant which purported to be an official order as distinguished from an official recommendation. If the letters of August 13, 1943 were only official recommendations, and the Cities Service Oil Company and its officers were not under any legal duty to comply, and ran no risk of fine, imprisonment or like sanction, then it is agreed that the letters were mere recommendations rather than 'orders' and this court would have no jurisdiction to review their validity. England et al. v. Devine, D. C. Mass., 1945, 59 F. Supp. 379. Thus the issue is whether there was any penalty for non-compliance with the letters of August 13."

The court concluded that the letter of August 13, 1943, was a duly authorized order, not merely a request or recommendation, and that disobedience of it by plaintiff's employer would have been a criminal offense under the Act of March 21, 1942, 56 Stat. 173, 18 U.S.C.A. § 97a. This Act reads as follows:

"That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misde-

meanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both, for each offense."

Prior to the passage of the Act of March 21, 1942, the President had issued Executive Order No. 9066 (7 F.R. 1407). Reciting that "the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities," the order authorized and directed "the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion."

On April 22, 1942, the Secretary of War designated Lt. Gen. Hugh A. Drum, Commanding General of the theretofore established Eastern Defense Command, as Military Commander to carry out the duties imposed by Executive Order No. 9066 for that portion of the United States embraced in the Eastern Defense Command.[1]

By Public Proclamation No. 1 dated May 16, 1942, Lt. Gen. Drum, as such designated Military Commander, prescribed a territory, including Massachusetts, as the Eastern Military Area.

The purpose of the Act of March 21, 1942, was to ratify and confirm Executive Order No. 9066 and to provide for

---

[1] The Eastern Defense Command comprises that portion of the continental United States east of the following line: the Ohio-Pennsylvania boundary, the West Virginia-Pennsylvania boundary, the West Virginia-Maryland boundary, the West Virginia-Virginia boundary, the Kentucky-Virginia boundary, the Tennessee-Virginia boundary, the Tennessee-North Carolina boundary, the Tennessee-Georgia boundary, the Alabama-Georgia boundary to its junction with Florida thence south along the Apalachicola River.

It so happens that the First Service Command, embracing Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, and part of New York falls within the area of the Eastern Defense Command. Notwithstanding this coincidence, the two commands must be sharply distinguished.

criminal enforcement of orders issued under the authority of that Executive Order, as appears from the review of the legislative history in the opinion of Chief Justice Stone in Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774.

█ The purported order of General Miles contained in the letter of August 13, 1943, was not issued under the authority of Executive Order No. 9066, and the sanctions of the Act of March 21, 1942, are inapplicable thereto. General Miles as Commandant of the First Service Command had never been vested by the Secretary of War with authority to prescribe a military area or military zone. He was not, therefore, a "military commander designated by the Secretary of War", nor "any such military commander," within the meaning of the Act of March 21, 1942. General Drum, Commanding General of the Eastern Defense Command, was the only Military Commander designated by the Secretary of War with authority to prescribe the Eastern Military Area and to impose restrictions applicable to such area.

In issuing the letter of August 13, 1943, General Miles acted under a distinctly different line of authority, deriving from Executive Order No. 8972, issued December 12, 1941 (6 F.R. 6420). This order recited that there existed a serious danger of sabotage to national-defense material, national-defense premises, and national-defense utilities which might menace our maximum productive effort, thereby making it necessary to take special precautionary measures. The order then proceeded to authorize and direct the Secretary of War and the Secretary of the Navy, whenever either of them might deem such action necessary or desirable, "to establish and maintain military guards and patrols, and to take other appropriate measures, to protect from injury or destruction national-defense material, national-defense premises, and national-defense utilities, as defined in the act of April 20, 1918, 40 Stat. 533, as amended by the act of November 30, 1940, 54 Stat. 1220, and the act of August 21, 1941, 55 Stat. 655 [50 U.S.C.A. §§ 101–106]."

The Assistant Secretary of the Navy and the Under Secretary of War issued a joint memorandum dated January 10, 1942, with respect to the procedure to be employed in removal of subversives from national defense projects of importance to Army and Navy procurement. This memorandum provided that when adequate investigation had revealed good cause for suspecting an employee of subversive activity on a national defense project of importance to Army or Navy procurement, the representatives of the Army or Navy might, without revealing the nature or source of the evidence, "request" the immediate removal of such individual from the project. The memorandum also provided that in case of such removal the individual involved might within 30 days thereafter file a written request for review in such manner as might be provided by the War or Navy Department, depending upon which service requested the particular dismissal.

Then followed War Department Circular No. 57 issued by the Secretary of War on February 20, 1943, specifically under the authority of Executive Order No. 8972. It provided:

" * * * By virtue of the authority vested in the Secretary of War by Executive Order No. 8972, dated December 12, 1941 (par. 5), the commanding generals, Army Ground Forces, Army Air Forces, Services of Supply, all defense commands, all service commands, all corps, the Military District of Washington, the Army Air Forces Material Command, the Chief of the Armored Force and the chiefs of supply services, and the commanding officers of all exempted stations are authorized and directed to establish and maintain military guards and patrols and to take other appropriate measures to protect from injury or destruction national-defense material, national-defense premises, and national-defense utilities, as defined in Executive Order No. 8972, in any case where action is necessary or desirable for such protection. * * *"

Circular No. 57 further stated that "appropriate measures"—the phrase used in Executive Order No. 8972—included "the

dismissal of subversives from private plants engaged in war production."

Thus, though Executive Orders Nos. 8972 and 9066 were both concerned with protection of national-defense material, national-defense premises, and national-defense utilities, against sabotage, Order No. 9066 had to do with the setting up of military areas or zones, the exclusion of suspected persons or groups of persons therefrom, and restrictions of movement within such areas (by curfew orders, for example). Order No. 8972 had to do with the protection of particular national-defense materials, national-defense premises, and national-defense utilities, without reference to whether such materials, etc., happened to be located within or without a prescribed military area.

■ The letter of August 13, 1943, was not an order of a "military commander" within the meaning of the Act of March 21, 1942. There is no doubt about this. The district court ruled, however, that when General Miles ordered the dismissal of plaintiff "he was acting for the Secretary of War, and his order was in legal effect an order of the Secretary of War"; and that the order was thus within the purview of the Act of March 21, 1942. We do not think that this is so. The order did not purport to be that of the Secretary of War, but was issued in the name of General Miles as Commanding General of the First Service Command. True, he issued the order under general authorization from the Secretary of War contained in War Department Circular No. 57; but General Miles caused the investigation to be made of the particular case, and made the decision to issue the particular order. When the Act of March 21, 1942, refers to orders "of the Secretary of War or any such military commander," it can hardly mean orders of the Secretary of War or of any of hundreds of subordinates pursuant to authority delegated by the Secretary. It appears to be confined to orders issued by the Secretary of War personally, or by one particular group of authorized subordinates —namely, by military commanders desig-

nated by the Secretary of War with authority to prescribe military areas or military zones.

Furthermore, if the letter of August 13, 1943, should be deemed in legal effect to be an order of the Secretary of War, it was still not an order issued under authority of Executive Order No. 9066, and did not relate to a military area or military zone as such, nor to exclusion therefrom, nor to restriction of movement therein—the type of order to which the sanctions of the Act of March 21, 1942, were intended to apply.

If the interpretation advanced by the district court were to be accepted, it would follow that any kind of order issued by any member of the military establishment under delegated authority from the Secretary of War would be disobeyed upon pain of fine or imprisonment under the Act of March 21, 1942, if the act of disobedience happened to occur at a place included within a prescribed military area. Such interpretation would expand the application of the Act far beyond its intended scope.

■ If we are correct in the foregoing, the court below should have dismissed the complaint for lack of jurisdiction. We recognize that the matter is not so clear as it might be. Therefore we deem it proper to add that if, contrary to our view, the letter of August 13, 1943, should be deemed in legal effect an order of the Secretary of War, disobedience of which would have subjected Cities Service Oil Company to the penalties of the Act of March 21, 1942, then we would agree with the district court that the order, so regarded, violated no constitutional right of the plaintiff. The full and satisfactory discussion of this phase of the case in the opinion of Judge Wyzanski below (D.C., 60 F.Supp. 962) needs no elaboration by us.

The judgment of the District Court is vacated and the case is remanded to the District Court with direction to enter judgment dismissing the complaint for lack of jurisdiction.

WOODBURY, Circuit Judge, concurs in the result.