Weldon Bruce **DAYTON**, Appellant,

v.

John Foster **DULLES**, Secretary of State, Appellee.

No. 13717.

United States Court of Appeals
District of Columbia Circuit.

Argued June 28, 1957.

Decided Oct. 24, 1957.

Writ of Certiorari Granted Jan. 6, 1958.
See 78 S.Ct. 343.

Judgment Reversed June 16, 1958.
See 78 S.Ct. 1127.

1. Hardy v. Gibson, 1957, 213 Md. 493, 133 A.2d 401.

Mr. Harry I. Rand, Washington, D. C., for appellant.

Mr. B. Jenkins Middleton, Attorney, Department of Justice, with whom Asst. Atty. Gen. George C. Doub, Mr. Oliver Gasch, U. S. Atty., and Mr. Paul A. Sweeney, Attorney, Department of Justice, were on the brief, for appellee.

Mr. Nathan H. David, Washington, D. C., filed a brief on behalf of the Federation of American Scientists, as amicus curiae, urging reversal.

Before PRETTYMAN, WILBUR K. MILLER and FAHY, Circuit Judges.

PRETTYMAN, Circuit Judge.

This controversy concerns an application for a passport. It is now here upon a second appeal. Upon the first appeal[1] we applied the rule we had laid down in the Boudin case[2] and remanded. The Secretary had rested his denial of the passport upon Section 51.135 of his Regulations[3] but without specification or findings sufficient to identify the subsection within which he classified Dayton. We held he must make such findings if his denial of the passport was to be sustained. Quoting from Boudin we further said that if the Secretary relied upon confidential information he must explain with such particularity as the circumstances permitted the nature of the reasons why this information might not be disclosed.

Upon the remand the Secretary rendered a Decision and Findings and again denied the passport. Upon representation the District Court granted the Secretary's motion for summary judgment and dismissed the complaint.[4] This appeal followed.

The decision and findings of the Secretary were divided into six sections.

Each of the first four sections dealt with a specific activity of Dayton. They were similar in format. The first section, for example, dealt with his activity in a Science for Victory Committee and his association with two named persons in that organization. The Secretary found, on the open record, that this activity and association existed. Then he found, on the basis of confidential information in the files of the Department, that this Committee had been organized by Communist Party officials as a front for propaganda and espionage activities and that the named persons were Communist Party members. In the second section of his findings the Secretary dealt in precisely similar fashion with Dayton's association and relationship with another named person, "an active member of the Communist Party * * * involved in the espionage apparatus of Julius Rosenberg." In the third section he recited his finding that Dayton was present on more than one occasion in the apartment building in which was the apartment used by Rosenberg "and other members of his spy ring for the microfilming of classified United States Government documents which were ultimately transferred to a foreign power." In the fourth section the Secretary found "a close association and relationship" with a person who "has engaged in numerous Communist activities both in this country and abroad; and is suspected of being a Communist espionage agent."

In Section V of his findings the Secretary said:

"I have reason to believe, on the balance of all the evidence, that the applicant is going abroad to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement. I have reached this conclusion on the basis

1. Dayton v. Dulles, 99 U.S.App.D.C. 47, 237 F.2d 43 (1956).

2. Boudin v. Dulles, 98 U.S.App.D.C. 305, 235 F.2d 532 (1956).

3. 22 C.F.R. § 51.135 (Supp.1956).

4. Dayton v. Dulles, 146 F.Supp. 876 (1956).

---

of the foregoing findings together with the confidential information contained in the files of the Department of State, the disclosure of which might prejudice the conduct of United States foreign relations."

Section VI of the findings is:

"The confidential information referred to in paragraphs I(b), II(b), III(b) and IV(b) above relates to the internal security of the United States. The substance of this confidential information was disclosed to the applicant during the consideration of his passport application. To disclose publicly the sources and details of this information would, in my judgment, be detrimental to our national interest by compromising investigative sources and methods and seriously interfering with the ability of this Department and the Executive Branch to obtain reliable information affecting our internal security. Moreover, it would have an adverse effect upon our ability to obtain and utilize information from sources abroad and interfere with our established relationships in the security and intelligence area; and might, with respect to information referred to in paragraph V, prejudice the interest of the United States foreign relations."

The conclusion of the Secretary was: "The passport application of Weldon Bruce Dayton is therefore denied under Section 51.135(c) of the Passport Regulations (22 CFR 51.135(c)), and because the issuance of a passport would be contrary to the national interest."

The validity of the Regulations of the Secretary in respect to passports has been upheld by us in Briehl v. Dulles, decided June 27, 1957.[5] In the present case the Secretary conformed strictly to the requirements laid down by us in Boudin v. Dulles and upon the original appeal in this case. He made findings and identified the precise provision of the Regulations within which he found Dayton.[6] He said the substance of the confidential information relied on in Sections I, II, III and IV had been disclosed to Dayton.

The Secretary stated, clearly and succinctly, that he denied the passport because he had reason to believe, partly from the open record and partly from confidential information, that Dayton was going abroad to engage in activities which would advance the Communist movement. The issuance of the passport, said the Secretary, would be contrary to the national interest. Further the Secretary stated, also clearly and succinctly, his confidential information relates to the internal security of the United States and to disclose it would be detrimental to the national interest in respect to internal security and might prejudice our foreign relations.

Thus the case falls into two parts. The first question is whether the grounds stated by the Secretary are sufficient to support the denial of the passport. If it be true that Dayton was going abroad knowingly and wilfully to advance the Communist movement, could the Secretary refuse him a passport? That question was answered fully in Briehl. We there held he could refuse upon that ground.

It is true that the Secretary did not here say in specific terms that he denied the passport because to grant it would be detrimental to internal security or foreign relations. But surely, after all that has been said and done about the Communist movement by this Government, described by us in Briehl, it is obvious that the advance of that movement is detrimental to the internal security of this country and to its foreign relations.

---

5. 101 U.S.App.D.C. 239, 248 F.2d 561.

6. Section 51.135(c): "Persons, regardless of the formal state of their affiliation with the Communist Party, as to whom there is reason to believe, on the balance of all the evidence, that they are going abroad to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement."

Clearly, when the Secretary, having made the finding as to Dayton's purpose, said that issuance of the passport would be contrary to the public interest, he meant the public interest in internal security and in foreign affairs. In the context of the record as it now is, in the light of the finding as to Dayton's purpose, "national interest" clearly means "internal security and foreign affairs". Any difference in meaning between those terms is of no moment here.

■■ The second question is whether the Secretary could base his conclusion in this matter partly upon confidential information. Even if the ground for denial is valid, is the denial valid if the evidence which establishes the ground is confidential? The Secretary stated, as we have pointed out, that disclosure of this information would be detrimental to the national interest in respect to internal security and the conduct of our foreign affairs. Our view is that upon that basis he need not disclose the information but he may act upon it.

The Supreme Court has not passed upon the precise question here before us, i. e., the permissible reliance upon confidential information in a passport case. But we find helpful guideposts in the principles laid down by the Court in different fields. The right to engage in business and the right to enter into contracts are parts of the liberty protected by the Fifth and Fourteenth Amendments. No person can be deprived of those rights except by due process of law. The guiding principle in respect to them is well set out in the West Coast Hotel case.[7] There the Court had before it a minimum wage act. The attack was that the statute was a deprivation of freedom of contract, a part of the liberty protected by due process of law. "The principle which must control our decision is not in doubt," the Court said. "Liberty under the Constitution is thus necessarily subject to the restraints of due process, and *regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process*."[8] (Italics supplied.) Quoting from its own opinion in Chicago, B. & Quincy R. Co. v. McGuire,[9] and referring to the freedom of contract, the Court said, "Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community."[10] The Court upheld a limitation upon the freedom of contract, upon the ground that community interest required protection of the health of women and of a relatively helpless class of workers.

In respect to contracts in foreign trade and doing business abroad, the Court has consistently held that the right can be denied by the President upon the basis of confidential information, that he need not disclose that information, and that the courts have no authority to inquire into it. In United States v. Curtiss-Wright Export Corp.[11] the Court had to determine the validity of a Joint Resolution which forbade the sale of munitions of war to persons in certain countries whenever the President proclaimed that the prohibition of such sales might contribute to the reestablishment of peace. The Court discussed at some length the use of confidential information in such matters.[12] It decided that embargo is within the area of foreign affairs, or at least may well affect foreign relations, and may well depend upon confidential information. The Court referred [13] to several earlier congressional

---

7. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937).

8. Id., 300 U.S. at page 391, 57 S.Ct. at page 581.

9. 219 U.S. 549, 567, 31 S.Ct. 259, 55 L. Ed. 328 (1911).

10. Supra note 7, 300 U.S. at page 392, 57 S.Ct. at page 582.

11. 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

12. Id., 299 U.S. at pages 319–322, 57 S.Ct. at pages 220–221.

13. Id., 299 U.S. at 325–327, 57 S.Ct. at page 224.

resolutions authorizing the President to prohibit the exportation of coal and other materials. In Panama Refining Co. v. Ryan [14] the Court had described the executive power of embargo as "cognate to" the conduct of foreign relations. In a more recent case [15] the Court considered an order which denied a certificate for overseas air transportation. The order recommended by the Civil Aeronautics Board was changed by the President and then approved by him, pursuant to the statute. But the reasons for the changes were not disclosed beyond a statement that "because of certain factors relating to our broad national welfare and other matters for which the Chief Executive has special responsibility, he has reached conclusions which require" changes in the Board's opinion. The question was whether the courts could review such a determination by the President. The Supreme Court held they could not. The Court said:

> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only

by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."[16]

Thus the Court held that due process is not violated if the right to do business abroad is denied upon the basis of confidential information pertaining to foreign affairs.

Those cases involved commerce, more readily subject to regulation, or deprivation, than are the inherent rights of individuals. We do not suggest that the scope of due process in respect to commerce is the same as it is in respect to such other rights. But we think the principles laid down by the Court in the commerce cases for determining the extent of necessary due process are of assistance in testing the nature of the process necessary to the deprivation of an individual right such as the right to travel abroad.

We turn to the problem before us. The right to travel is a part of liberty. A person can be deprived of it only by due process of law. A regulation of a liberty, reasonable in relation to its subject and adopted in the interest of the community, is due process. Travel abroad by some people for some purposes may under some circumstances involve our foreign relations or our national security. Travel abroad to advance the Communist movement is obviously, on its face, "cognate to" or may well affect our foreign affairs and our national security. Obviously a determination that a certain person wants to go abroad for the purpose of advancing the Communist movement may depend upon information gleaned from diplomatic or consular sources or from other sources abroad

14. 293 U.S. 388, 422, 55 S.Ct. 241, 79 L. Ed. 446 (1935).

15. Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

16. Id., 333 U.S. at page 111, 68 S.Ct. at page 436.

important to our well-being. Determinations made by Executive officials upon such information have traditionally, and by virtue of constitutional provisions relating thereto, been lodged in the Executive, and the confidence in which he has received that information has never been violated or even questioned by the legislative or judicial branches of the Government. We have before us a determination by the Secretary of State, based upon confidential information derived from sources available to him in the course of the performance of his duties, that a certain person intends to go abroad to advance the Communist movement. The Secretary disclosed to the person the substance of this confidential information. Upon the reasoning indicated in the foregoing paragraphs we conclude that this procedure satisfies the requirements of due process in such a matter. The community interest makes it necessary that this be so. The right to travel abroad may be denied upon that basis.

Americans always resent and oppose the deprivation of liberty upon the basis of undisclosed information. We do so in this area. We would not agree to it except in necessitous circumstances of public concern. Such circumstances are here.

In Shachtman v. Dulles [17] we emphasized that the Government may not arbitrarily deny a passport and that the question is one of substantive due process. In doing so we cautioned:

"What is arbitrary, however, in the sense of constituting a denial of due process, depends upon circumstances. [Citing cases.] Restraint upon travel abroad might be reasonable during an emergency though in normal times it would be arbitrary. World conditions, and those in particular areas, as to which the Executive has special information and on the basis of which

he is especially qualified to make decisions, bear upon the question. For reasons thus suggested the issuance of passports throughout our history has been left to the judgment of the Secretary of State under Presidential regulation, and is subject only to constitutional safeguards. And even these must be defined with cautious regard for the responsibility of the Executive in the conduct of foreign affairs." [18]

And we further cautioned:

"We must not confuse the problem of appellant's application for a passport with the conduct of foreign affairs in the political sense, which is entirely removed from judicial competence. For even though his application might be said to come within the scope of foreign affairs in a broad sense, it is also within the scope of the due process clause, which is concerned with the liberty of the individual free of arbitrary administrative restraint. There must be some reconciliation of these interests where only the right of a particular individual to travel is involved and not a question of foreign affairs on a political level." [19]

We adhere to those views. The issuance of a passport is not the conduct of foreign affairs. The Secretary does not have unfettered discretion in respect to it—nor does he claim it. His regulations specify the persons to whom he will not issue passports and indicate the reasons for such rules. They contemplate factual conclusions after opportunity is afforded the applicant for hearing. All this the Secretary has done. We have found his substantive regulations valid, and he has meticulously complied with them. The other question—not the grounds upon which the passport was denied but the evidence which established the grounds —is a different question. There the

17. 96 U.S.App.D.C. 287, 225 F.2d 938 (1955).

18. Id., 96 U.S.App.D.C. at pages 290–291, 225 F.2d at pages 941–942.

19. Id., 96 U.S.App.D.C. at page 293, 225 F.2d at page 944.

problem is whether disclosure would adversely affect our internal security or the conduct of our foreign affairs. The cases and common sense hold that the courts cannot compel the Secretary to disclose information garnered by him in confidence in this area. If he need not disclose the information he has, the only other course is for the courts to accept his assertion that disclosure would be detrimental in fields of highest importance entrusted to his exclusive care. We think we must follow that course.

The judgment of the District Court is Affirmed.

FAHY, Circuit Judge (dissenting).

In the developing law growing out of litigation due to the fact that denial of a passport has the effect at this time of depriving a person of a right to travel he otherwise would have, Shachtman v. Dulles, 96 U.S.App.D.C. 287, 225 F.2d 938, I think this case requires still further consideration by the Secretary. In dissenting in Briehl v. Dulles, 101 U.S. App.D.C. 275, 248 F.2d 597, I gave my reasons for the view that the Secretary has power to deny a passport though the applicant has the basic qualification of being a person who owes allegiance to the United States.[1] But I could find no greater power, either inherent in the Executive or delegated by the Congress, than to deny the passport when necessary "to prevent the reasonable likelihood of harm to our national defense or to the conduct of our foreign affairs." And in all cases of denial procedural due process is required. Unless the authority is held within these bounds it seems to me the alternative is to say, as Judge Bazelon has said in his dissent in Briehl, that regulations embodying such substantive criteria as have been before us in recent passport cases lack all validity under present legislation.

I am convinced that the Congress has attempted foreign-travel control of individuals, and has not merely contemplated quarantining, as it were, certain areas. For example, 8 U.S.C.A. § 1185 (b),[2] restricts the right of any citizen to "enter" as well as to "depart from  *  * the United States" when "the United States is at war or during the existence of any national emergency proclaimed by the President." This attempted control should not be judicially nullified if it can be reasonably sustained consistently with the Constitution. As I said in my Briehl dissent, I think it reasonable to construe the Congressional exertion of control, together with the Executive authority in the area of foreign affairs, to extend to such control as is exercised, consistently with procedural due process, within the criteria stated in my Briehl dissent, but no further under existing law.

In the present case the findings of the Secretary and the Regulations applied by him were not framed within those criteria. I realize the weight of Judge Prettyman's opinion that the Secretary's action under section 51.135(c) of the Regulations, and his reference to "the national interest," can be construed to bring the denial within the criteria to which I have referred, but it seems to me we should not be left thus to interpret the decisional basis when the Secretary has not himself expressed it in terms of the authority he possesses. A finding that the denial is in the "national interest" is too broad when the particular national interest is not broken down to come within the governing criteria. The finding that appellant's travel would lead to activities knowingly engaged in to advance the Communist movement is subsidiary to the basic finding framed in terms of the "national interest." In other words, in denying this passport the issuing authority has not focused upon the question whether the grant would be likely to cause harm to national defense or to the conduct of foreign

---

1. I assumed that such an applicant also complied with the Regulations having to do with identity and other more or less formal or administrative matters.

2. 66 Stat. 190 (1952).

affairs. This is no doubt due to the fact that under the Regulations applied to this case the Secretary has not felt limited to the criteria which I think should govern his action.

While the court should not order the passport to be issued, I think the basis for the denial now before us is not within the terms of the authority available under existing law. While my position, if it prevailed, would entail further delay this seems to me unavoidable in the process of working out legal solutions to the problems involved.