**William L. GREENE, Appellant,**

v.

**Neil H. McELROY, Secretary of Defense, et al., Appellees.**

**No. 13978.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 22, 1957.

Decided April 17, 1958.

Subsection (a) provides that only· debt claims due and owing at the time of vesting or transfer are to be allowed under § 34.

Mr. Carl W. Berueffy, Washington, D. C., for appellant.

Mr. Donald B. MacGuineas, Attorney, Department of Justice, with whom Asst. Atty. Gen. George C. Doub and Messrs. Oliver Gasch, U. S. Atty., Paul A. Sweeney and Miss Beatrice M. Rosenhain, Attorneys, Department of Justice, were on the brief, for appellees.

Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.

WASHINGTON, Circuit Judge.

This case challenges the revocation of a "security clearance" by the Secretary of the Navy. The Secretary's act withdrew from appellant Greene, an employee of a private corporation holding Defense Department contracts, access to classified defense information. The instant appeal seeks reversal of an order of the District Court, 150 F.Supp. 958 (D.C.D.C.1957), dismissing appellant's complaint for lack of a justiciable controversy between appellant Greene on the one hand, and the Secretary of Defense and his subordinate the Secretary of the Navy on the other.

I.

The facts of the case are these: Upon graduation from the Guggenheim

School of Aeronautics at New York University in 1937, appellant Greene was hired as a junior engineer by Engineering & Research Corporation (ERCO), a manufacturing company. From that time until he was dismissed by the corporation in April 1953, he worked for ERCO continuously (save for a short period in 1940 not here relevant). At the time of his dismissal he was ERCO's Vice President in charge of Engineering and General Manager at an annual salary of $18,000 plus bonuses. He then possessed Government clearance for access to "secret" information.[1] His dismissal followed receipt by ERCO's President of the following letter dated April 17, 1953, from appellee Secretary of the Navy:

"I have reviewed the case history file on William Lewis Greene and have concluded that his continued access to Navy classified security information is inconsistent with the best interests of National security.

"In accordance with paragraph 4.e. of the Industrial Security Manual for Safeguarding Classified Security Information,[2] therefore, you are requested to exclude William Lewis Greene from any part of your plants, factories or sites at which classified Navy projects are being carried out and to bar him access to all Navy classified security information.

"In addition, I am referring this case to the Secretary of Defense recommending that the Industrial Employment Review Board's decision of 29 January 1952 be overruled."

One week later the President of ERCO, acting pursuant to the security agreement which ERCO had executed,[3] replied to the Secretary, in part:

"In accordance with your request, please be advised that since receipt of your letter this company has excluded Mr. Greene from any part of our plants, factories or sites and barred him access to all classified security information."

Appellant subsequently requested, and was accorded, extensive administrative hearings, the details of which need not be recounted here. At these hearings appellant was given a thirteen count specification of the reasons for the revocation of his clearance. The Government put on no witnesses, nor did it disclose the investigative reports on which the specifications were based. Appellant took the stand, and presented a number of witnesses. He was finally advised, as of May 28, 1954, that "the granting of clearance to you for access to classified infor-

1. Greene was cleared for access to "confidential" information by the Army on August 9, 1949; for "top secret" by the Assistant Chief of Staff, G–2, Military District of Washington on November 9, 1949; for "top secret" by the Air Materiel Command on February 3, 1950; and for "secret" by the Industrial Employment Review Board on January 29, 1952.

2. The Industrial Security Manual for Safeguarding Classified Matter was issued by the Department of Defense in January 1951 and subsequently revised. For current edition see 2 Gov't Sec. & Loy.Rep. 25:95 (Feb. 1957). The Manual is incorporated by reference in the Department of Defense Security Agreement (DD Form 441) which must be executed by all defense contractors who wish to secure facility security clearance. Paragraph 4(e) of the Manual (now par. 5 (c) ) provided:

"e. The Contractor shall exclude (this does not imply the dismissal or separation of any employee) from any part of its plants, factories, or sites at which work for any military department is being performed, any person or persons whom the Secretary of the military department concerned or his duly authorized representative in the interest of security, may designate in writing."

3. It was stipulated between the parties that "Under date of June 5, 1951, the United States, acting through the Navy Department, entered into a security agreement with Engineering and Research Corporation. * * * During April, 1953, the Navy Department and Engineering and Research Corporation were parties to classified procurement contracts * * *. All of such classified procurement contracts incorporated by reference the aforesaid Industrial Security Manual, including Paragraph 4e thereof."

mation is not clearly consistent with the interests of national security."

In August 1954 appellant filed this action in the District Court seeking a judgment (1) declaring "illegal, null, void and of no effect * * * the acts of the defendant [Secretary of the Navy] Anderson and all acts of the defendants in pursuance thereof, in advising plaintiff's employer that plaintiff could not be employed," and (2) ordering the appellees "to advise the plaintiff's employer, Engineering and Research Corporation, that the letter of April 25 [17?] signed by * * * Anderson * * * is illegal, null, void, and of no effect."

In February 1955—before Greene's lawsuit had come to issue—the Department of Defense issued its Industrial Personnel Security Review Regulation, Department of Defense Directive 5220.6, 20 Fed.Reg. 1553 (1955), superseding the joint directive under which Greene's clearance had been revoked. The new directive, *inter alia,* established revised procedures for screening industrial personnel, and the Board set up thereunder was given authority to review prior decisions of regional boards "on the grounds of newly discovered evidence or for other good cause shown."[4] The standard under the new regulation remained that "clearance shall be denied or revoked if it is determined, on the basis of all the available information, that access to classified information by the person concerned is not clearly consistent with the interests of the national security."[5] At Greene's request the new Board undertook to reexamine his case. After submission of further briefs, the Director, Office of Industrial Personnel Security Review, notified appellant's attorney on March 12, 1956, that the Review Board had affirmed the May 1954 decision.

After this adverse decision the case in the District Court proceeded to trial. A stipulation of facts was entered. Both parties moved for summary judgment; the Government also moved to dismiss. It was admitted that appellant had exhausted his administrative remedies. The District Court denied appellant's motion and granted appellees' motions in a memorandum opinion. The court held, relying on paragraph 4.e. of the Industrial Security Manual, see note 2, *supra,* that there was no justiciable controversy:

"It is fundamental when one presumes to accept a contractual offer then that offer must be accepted in terms, and one of the terms here, as has been said, related to security controls. The necessity for such is obvious. If the plaintiff's employer did not see fit to accept and conform it had perfect freedom not to enter into the contract. On acceptance of the offer in terms, it was obliged in the circumstances to carry out its essentials, the presumed result of which was the loss by the plaintiff of his position. But this cannot be said in any degree to be the fault of the Government, for here, through properly constituted authority, it was exercising its right to protect itself against threats to its survival, and as far as the action of an individual was concerned, this action taken, even envisioning the result to the plaintiff, fails to set forth any invasion of his legal rights and, therefore, as has been said, there is no justiciable controversy and the Government's motion for summary judgment is granted.

"Assuming arguendo he was entitled to hearing and review, he was accorded such and an examination of the extensive and repetitive record fails to show any violation of procedural due process. It should be noted also that the hearings held in the instant case apparently are exempted from the requirements of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., as hearings held 'by regulation, rule, custom, or special dispensation; not * * * held by compulsion.' Wong Yang

4. DOD Directive 5220.6, par. 24.a, 32 C.F.R. § 67.5–2(a) (Supp.1957).

5. DOD Directive 5220.6, par. 12, 32 C.F.R. § 67.3–1 (Supp.1957).

Sung v. McGrath, 1950, 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616." D.C.D.C.1957, 150 F.Supp. 958, 959–60.

This appeal followed.

It should be noted at the outset that Greene does not here contend that the officials of the Department of Defense have failed to comply with the relevant provisions of the various industrial security regulations under which they proceeded against him. To that significant extent at least, this case differs from Peters v. Hobby, 1950, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129; Service v. Dulles, 1957, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed. 2d 1403; and Cole v. Young, 1956, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396. In each of those cases the issue treated by the Court was the compliance *vel non* by executive officers with applicable statutes or regulations. And in each of those cases the Supreme Court found lack of compliance. See also Stewart v. Dulles, 1957, 101 U.S.App.D.C. 280, 248 F.2d 602; cf. Vitarelli v. Seaton, 1958, 102 U.S.App.D.C. 316, 253 F.2d 338. It should further be noted that appellant does not claim that the contracts on which he seeks to work are not validly labelled "classified."

The relief Greene seeks is a declaration that he was barred from access to classified material in a manner which violates the Constitution. He seeks further a court order restoring him to *status quo ante:* i.e., an order which will make it possible for ERCO to rehire him. Thus, in essence, he seeks to compel the Government to disclose its classified defense information to a person—himself—whom the Secretary of Defense considers unworthy of such access.

## II.

We consider first Greene's contention that the Secretary lacked power to take the action here challenged. He does not argue that the executive lacks all power—inherent or statutory—to classify certain defense information. Nor does he suggest that the subject matter of the ERCO contracts was not properly labelled "secret." Rather he argues that the Secretary possesses only limited powers—powers circumscribed by the Fifth Amendment—to decide who shall have access to that classified material.

The Government contends that it possesses statutory authority to restrict access to classified defense information,[6] stemming from Rev.Stat. § 161 (1875), 5 U.S.C.A. § 22, which provides:

"The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."

Additionally, the Government relies on the Armed Services Procurement Act of 1947, 62 Stat. 21, 41 U.S.C. §§ 151–161 (1952),* which provides, in part:

"§ 151.(c) All purchases and contracts for supplies and services shall be made by advertising, as provided in section 152 of this title, except that such purchases and contracts may be negotiated by the agency head without advertising if—

"(1) determined to be necessary in the public interest during the period of a national emergency declared by the President or by the Congress;

\* \* \* \* \* \*

"(12) for supplies or services as to which the agency head determines that the character, ingredients, or components thereof are such that the

---

**6.** It should be noted that at this point we are discussing only the power of the Secretary to withhold classified defense information. We are *not*, at this point, discussing the withholding from Greene of the reports of informants and Federal Bureau of Investigation reports in the proceedings in which Greene challenged the revocation of his clearance.

\* Now 10 U.S.C.A. § 2301 et seq.

purchase or contract should not be publicly disclosed;

\*　\*　\*　\*　\*　\*

"§ 153 \* \* \* contracts negotiated pursuant to section 151(c) of this title may be of any type which in the opinion of the agency head will promote the best interests of the Government. \* \* \*"

 In this latter statute Congress gave to the Defense Department power—during an emergency[7]—to purchase its supplies by means of negotiated contracts, rather than through public, competitive bids. And it seems to us that Congress specifically gave to the Secretary of Defense broad discretion to determine in what manner the "character, ingredients, or components" covered by the contract should be safeguarded from disclosure. We think that the Procurement Act permits the Secretary of Defense to classify defense information for purposes like the present one. Thus we need not determine whether the "housekeeping" statute, 5 U.S.C.A. § 22, is an independent source of executive authority for withholding defense or other types of executive information.

Furthermore, Executive orders specifically direct department heads to make appropriate provision for safeguarding classified defense information in accord with the congressional authorization of the department head to enter into negotiated contracts.[8] Executive Order No. 10501, and its predecessor Executive Order No. 10290, in their full terms, provide an adequate guide to the Secretary for protecting certain defense information from the risk of improper disclosure during industrial operations, and for enabling him to determine when "the character, ingredients, or components \* \* \* should not be publicly disclosed."

 Further, we think that the Secretary has, and of necessity must have, wide latitude in designating persons qualified for access to classified defense information in situations like the present —namely, where the problem relates to the selection of persons to be given that information for the purpose of designing or producing for the Government weapons or other defense materials.[9] Authority of that sort is a necessary adjunct to the power and duty to defend the security of the Nation and, in time of national emergency,[10] to enter into negotiated contracts—contracts of "any type which in the opinion of the agency head will promote the best interests of the Government." One of the primary functions of government is to preserve the national existence. In the exercise of that function, the Government has concluded that

---

**7.** A state of national emergency was declared by the President on December 16, 1950. Proclamation No. 2914, 50 U.S. C.A.Appendix, preceding § 1, 15 Fed.Reg. 9029. This proclamation was in effect during all of the administrative proceedings in this case.

**8.** See, for example, Executive Order No. 10290, 50 U.S.C.A. § 401 note, 16 Fed. Reg. 9795, 9799 (1951), which provides:
"30. \* \* \*
"b. *Outside the Executive Branch.* Classified security information shall not be disseminated outside the Executive Branch by any person or agency having access thereto or knowledge thereof except under conditions and through channels authorized by the head of the disseminating agency, even though such person or agency may have been solely or partly responsible for its production."
See also Executive Order No. 10501, 50

U.S.C.A. § 401 note, 18 Fed.Reg. 7049 (1953) at Section 7(b).

**9.** We are not dealing here with the vexed questions of the right of Congress, or the press, or the public, to be informed of defense operations generally, or to inspect particular documents. On this subject, see Mitchell, Government Secrecy in Theory and Practice: "Rules and Regulations" as an Autonomous Screen, 58 Colum.L.Rev. 199 (1958); Wolkinson, Demands of Congressional Committees for Executive Papers, 10 Fed.Bar J. 103, 223, 319 (1949); Bishop, The Executive's Right of Privacy: An Unresolved Constitutional Question, 66 Yale L.J. 477 (1957); 40 Ops.Att'y Gen. 45 (1941). See also Hand, The Bill of Rights 17–18 (1958).

**10.** See fn. **7**, supra.

secret designs and processes for the production of its own weapons must be protected from disclosure to any persons except those regarded as trustworthy.

■■ Since the Secretary has power to label information "secret" and to designate certain persons for access to that information, *a fortiori* he has power to make regulations to guide himself and his subordinates in such labeling and designation. We are not called upon to decide whether in our view all the regulations he has from time to time promulgated in this field are in every particular or in every possible situation valid and effective. It is enough to say that in our view the general program for industrial security, as reflected in the regulations cited above,[11] does not exceed his authority. We point out in this connection that the regulations are designed to give industrial employees whose trustworthiness is challenged a reasonable measure of information as to the Government's reasons for the challenge, together with an opportunity to make a defense, and to appeal an adverse decision.

### III.

Appellant claims that the regulations operate to deprive him of his occupation without due process. But the Government has not here attempted to regulate an entire branch of the working population, regardless of the lack of any direct relationship of the tasks of a particular worker to the requirements of the national security, cf. Parker v. Lester, 9 Cir., 1955, 227 F.2d 708; Brown & Fassett, Security Tests for Maritime Workers: Due Process under the Port Security Program, 62 Yale L.J. 1163 (1953). Nor has it sought to exclude Greene from serving the general public in those aspects of his profession not connected with secret Government information. Cf. Schware v. Board of Bar Examiners, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed. 2d 796 (involving complete exclusion from law practice, after procedures based on unjustified inferences as to moral character); Konigsberg v. State Bar,

1957, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed. 2d 810. This is not a case such as Truax v. Raich, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, relied on by appellant, where discriminatory governmental action was taken against a class (there, aliens) in such terms as to affect "the conduct of ordinary private enterprise," 239 U.S. at page 40, 36 S.Ct. at page 10 and to deny "the right to work for a living in the common occupations of the community," 239 U.S. at page 41, 36 S. Ct. at page 10. Rather, the Government has here denied Greene access to its military secrets, as contained in its classified documents, under a program having a direct relationship to the requirements of the national defense, and not inherently unreasonable in its coverage or procedures.

■■ Greene points to the fact that he was not confronted with his accusers, and that confidential reports were not revealed to him. But, in our view, confrontation with one's accusers is clearly not required in circumstances like the present. It may be noted that in the case of Federal employees Congress long ago provided in the Lloyd-LaFollette Act that "no examination of witnesses nor any trial or hearing shall be required" when dismissals are made under the provisions of that Act. 37 Stat. 555 (1912), as amended, 5 U.S.C.A. § 652(a). A limited form of hearing is provided under the Veterans Preference Act of 1944, for those entitled to its benefits. 58 Stat. 390 (1944), as amended, 5 U.S. C.A. § 863. And the Loyalty Order of March 21, 1947, Executive Order No. 9835, 5 U.S.C.A. § 631 note, 12 Fed.Reg. 1935, granted hearings to employees who sought them in loyalty matters covered by that order. But mandatory confrontation with accusers is unknown, so far as we know, in dismissals of Federal employees, and has been since the beginning of our Government. See Bailey v. Richardson, 1950, 86 U.S.App.D.C. 248, 182 F.2d 46, affirmed by an equally-divided Court, 1951, 341 U.S. 918, 71

---

11. See fns. 2 and 4, supra, and DOD Directive 5220.6, 20 Fed.Reg. 1553 (1955).

S.Ct. 669, 95 L.Ed. 1352; cf. Vitarelli v. Seaton, supra. Surely appellant is entitled to no more than is available to civil servants, under existing statutes and existing interpretations of the Constitution.

Much the same must be said of the Government's refusal to disclose to appellant confidential reports of the FBI and other investigative agencies. In certain circumstances, it is true, the courts have penalized the Government for its refusal to disclose information. For example, the courts have said that if the Government brings a criminal prosecution against a person and refuses to disclose certain information necessary for a proper defense, the Government's prosecution must fail. See Jencks v. United States, 1957, 353 U.S. 657, 77 S. Ct. 1007, 1 L.Ed.2d 1103; cf. United States v. Reynolds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727; Totten v. United States, 1875, 92 U.S. 105, 23 L.Ed. 605. But in none of the instances which we have discovered have courts actually ordered the Government to disclose information contrary to its own wishes. In the present case, the only sanction the courts could employ against the Government for failure to disclose all of the information used against Greene would be to declare the revocation of Greene's clearance invalid. If this had any practical effect at all—and courts seldom issue orders which have no practical effect—it would amount to ordering his restoration to access to classified information. This in turn would require the executive to disclose a state secret to Greene or to cancel its contracts with ERCO. No court has yet forced the Government to choose between such alternatives—either of which might compromise the security of the country.[12]

To quote from the observations of Judge Wyzanski in Von Knorr v. Miles, D.C.Mass.1945, 60 F.Supp. 962, 970, a somewhat similar case arising during World War II:

"Two interests are in competition and must be considered: the government's concern to prevent both sabotage and disclosure to the enemy of secret processes, statistics and information; and the private individual's concern to go where he pleases and engage in such work as is offered him."

After concluding that no constitutional right of the plaintiff Von Knorr had been infringed,[13] Judge Wyzanski went on to say:

12. We have not overlooked the decision of the Supreme Court in Harmon v. Brucker, 1958, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed. 503. The instant case differs from that in many ways. The main difference for present purposes is that Harmon was not seeking to remain in the Army. Rather he was seeking only to have the Army comply with its own discharge authority under applicable statutes and regulations, and issue him an honorable discharge. Here Greene is essentially seeking to revert to his former status with access to classified defense information. Had Harmon sought an order requiring the Secretary of the Army to retain him in military service, an entirely different case would have been presented.

13. The following is pertinent, though we need not go so far in the instant case:
"Notice, hearing, counsel and the like are admittedly usually appropriate criteria of due process of law. But these guarantees have significance only if in the end the government's right to act turns on an official finding that certain facts exist. Compare Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129. Where in rare cases such as orders excluding persons from defense plants in war time, the government's right to act is absolute and not dependent upon the facts concerning, or the merits of, any particular case, the formalities of a notice, hearing and counsel are not requisite. Compare United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, 49 L.Ed. 1040. No matter what evidence might be offered by counsel for the government or counsel for the individual, the government would remain legally free to disregard the testimony and rely upon its uncorroborated suspicions. Since in this highly exceptional case, because of its vital interest in war materials and war secrets during war time the government's exclusionary powers are complete, it can refuse admittance to defense plants

"It is hardly necessary to add that these conclusions of law do not imply that this court believes that it is desirable, as distinguished from legal, for a government, no matter how absolute its power may be, to deny a chance for employment to any citizen merely on the basis of suspicion. Military commanders, like other authorities, will no doubt find it possible as well as just in most cases to give an employee notice of the facts which create their suspicion about him and a chance to present his side of the case. Even where power is free of judicial restraint, those who wield it may impose upon themselves self-restraint. And they may accept as canons for their conduct the standards of procedure which in the overwhelming majority of cases are regarded as fundamental to fair play." 60 F. Supp. at pages 969–971.

Although the First Circuit vacated the District Court judgment on other grounds, sub nom. Von Knorr v. Griswold, 1 Cir., 1946, 156 F.2d 287, the Court of Appeals, speaking through Judge Magruder, approved the holding quoted above:

"If we are correct in the foregoing, the court below should have dismissed the complaint for lack of jurisdiction. We recognize that the matter is not so clear as it might be. Therefore we deem it proper to add that if, contrary to our view, the letter of August 13, 1943, should be deemed in legal effect an order of the Secretary of War, disobedience of which would have subjected Cities Service Oil Company to the penalties of the Act of March 21, 1942, then we would agree with the district court that the order, so regarded, violated no constitutional right of the plaintiff. The full and satisfactory discussion of this phase of the case in the opinion of Judge Wyzanski below (D.C., 60 F.Supp

without giving an explanation, without listening to a protest and without the

962) needs no elaboration by us." 156 F.2d at page 292.

Our views are substantially similar to those expressed by Judge Wyzanski and Judge Magruder. And what has so far been said is an answer, we think, to Greene's contention that he is being "punished" without due process of law. His argument essentially is that because he once was allowed to see confidential documents he has acquired a "status" which cannot be taken from him without full adversary proceedings, attended with most of the safeguards known to the criminal law. We think this ignores the necessities of the Government, and the public interest in maintaining the security of the Nation. As we have indicated, we find no basis for it in the law.

### IV.

We have no doubt that Greene has in fact been injured. He was forced out of a job that paid him $18,000 per year. He has since been reduced, so far as this record shows, to working as an architectural draftsman at a salary of some $4,400 per year. Further, as an aeronautical engineer of considerable experience he says (without real contradiction) that he is effectively barred from pursuit of many aspects of his profession, given the current dependence of most phases of the aircraft industry on Defense Department contracts not only for production but for research and development work as well. Thus, it seems unrealistic to say—as does the Government in its brief—that:

"The Secretary's letter presented ERCO with three choices: (1) it could have continued to employ appellant on any work except that requiring access to Navy classified information; (2) it could have continued appellant's employment and declined to perform Navy classified contracts; or (3) it could have concluded it did not, in the circumstances, choose to continue appellant's employment. That ERCO

semblance of a trial." 60 F.Supp. at page 971.

chose to discharge appellant was its own decision, one neither suggested nor required by appellees."

As a practical matter—given Greene's position as Vice President and General Manager and given the applicable Industrial Security regulations—the Government caused Greene to be dismissed from his job at ERCO.[14] The small contractor has no effective choice when that choice is either to continue to do business with the Government or to do virtually no business at all. Nor do we doubt that, following the Government's action, some stigma, in greater or less degree, has attached to Greene.

 The reality of the injury, however, does not mean that Greene is entitled, without more, to judicial relief. There must be a "justiciable" controversy—one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence. Here there is no such controversy. As we have seen, Greene makes no claim of lack of compliance by the Government with its own regulations. He attacks the Secretary's decision on its merits and as a matter of constitutional right. But for a court to hear de novo the evidence as to Greene's fitness to be assigned to a particular kind of confidential work would be a bootless task, involving judgments remote from the experience and competence of the judiciary. Indeed, any meaningful judgment in such matters must rest on considerations of policy, and decisions as to comparative risks, appropriate only to the executive branch of the Government.

It must rest also on a mass of information, much of it secret, not appropriate for judicial appraisal. See Dayton v. Dulles, 1957, 102 U.S.App.D.C. 372, 254 F.2d 71, reversed on other grounds, 1958, 357 U.S. 144, 78 S.Ct. 1127, 2 L.Ed.2d 1221; United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 319–322, 57 S.Ct. 216, 81 L.Ed. 255.

A direct Government employee normally has procedural rights conferred by Congress, which the courts will protect. See cases cited in Vitarelli v. Seaton, supra, at note 1. But even in the case of a Government employee the courts will not inquire into the merits of a dismissal: they will inquire whether required procedures have been observed, or an applicable statute violated, but they will not—for example—attempt to determine whether an employee is or is not a "security risk," or is "untrustworthy." Vitarelli v. Seaton, supra, at note 7. No more can the courts examine the merits of Greene's claim that he is trustworthy. In many instances, indeed, such a course would be fruitless: if the official in charge is convinced of a man's unreliability, the entire situation might be such that he could not in conscience permit the contract with the employer to remain in effect.

The personal tragedy revealed by this recital needs no emphasis. As we have recognized, the reality of the injury suffered by Greene—whether or not deserved—is perfectly clear. So, too, is the risk which the United States must take in denying itself the benefit of the services of a man apparently so proficient in the science of modern warfare. A government which is too cautious in

---

14. In May 1954, when the revocation of Greene's clearance was affirmed, the applicable facility clearance regulations required that all officers and key personnel of a corporation holding classified defense contracts must have clearance. See 32 C.F.R. § 72.8 (1955). This requirement has been carried forward into subsequent revisions of the program. See 32 C.F.R. § 72.2–107 (Supp.1956); Security Manual for Safeguarding Classified Information, Par. 16, 2 Gov't Sec. & Loy.Rep. 25:111 (1957).

To some extent the Government acknowledges that withdrawal of clearance may mean the firing of the employee. Provision is made for payment of lost earnings to a contractor employee where, after suspension of clearance, the final determination is favorable to the individual concerned. See Industrial Security Review Regulation, 32 C.F.R. § 67.5–4 (Supp.1957).

such matters may ultimately have few secrets to protect, or able workers to serve it.

In a mature democracy, choices such as this must be made by the executive branch, and not by the judicial. If too many mistakes are made, the electorate will in due time reflect its dissatisfaction with the results achieved. It would be an unwarranted interference with the responsibility which the executive alone should bear, were the judiciary to undertake to determine for itself whether Greene or any other individual similarly situated is in fact sufficiently trustworthy to be entitled to security clearance for a particular project.

For these reasons, the order of the District Court must be

Affirmed.